1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9   GREGORY LYNN NORWOOD,                  CASE NO. 1:09-cv-00330-AWI-GBC PC

10                      Plaintiff,          FINDINGS AND RECOMMENDATIONS
                                            RECOMMENDING GRANTING
11            v.                            DEFENDANTS' MOTION FOR SUMMARY
                                            JUDGMENT
12   MATTHEW L. CATE, et al.,

13                      Defendants.         (Doc. 45)

14                                          OBJECTIONS DUE WITHIN THIRTY DAYS
                                        /
15

16        **FINDINGS and RECOMMENDATIONS**

17   **I.      Procedural History**[1]

18        Plaintiff Gregory Lynn Norwood ("Plaintiff") is a state prisoner proceeding pro se and in

19   forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. Doc. 10. The Court screened

20   the complaint and found that Plaintiff's first amended complaint, filed on August 14, 2009, stated

21   an Eighth Amendment claim against Defendants Kenneth Clark, K. Allison, T. P. Wan, J. Reynoso

22   and W. J. Sullivan, stemming from their involvement with the prison's race-based lockdowns which

23   deprived Plaintiff of outdoor exercise. Doc. 11; Doc. 15; Doc. 17; Doc. 19; Doc. 20. In addition to

24

---

25        [1] The recent decision in *Woods v. Carey*, 2012 WL 2626912, finds that in meeting the "fair notice"
26   requirements for opposing a motion for summary judgment, such notice must be given at the time the motion is
     brought "unless it is clear from the record that there are no facts that would permit the inmate to prevail." *Woods v.*
27   *Carey*, Nos. 09-15548, 09-16113, 2012 WL 2626912, at *5-6 (9th Cir. Jul. 6, 2012). In this instance, Plaintiff has
     more than adequately met the requirements for opposing the motion for summary judgement and it is clear from the
28   record that no additional facts would change the outcome of the case. *See Woods v. Carey*, Nos. 09-15548,
     09-16113, 2012 WL 2626912, at *6 (9th Cir. Jul. 6, 2012).

monetary damages, Plaintiff seeks an injunction requiring prison officials to provide yard or "mini concrete yard" exercise within twenty-one days of a lockdown when the racial groups involved can be separated.  Doc. 10.

On August 16, 2010, the Court issued an amended discovery and scheduling order setting the dispositive motion deadline for May 10, 2011.  Doc. 28.  On April 22, 2011, the Court granted Defendants' motion for a sixty-day extension of time to submit a motion for summary judgment.  Doc. 41.  On June 21, 2011, Defendants filed a motion for summary judgment.  Doc. 45; Doc. 46.  After an extension of time, on July 25, 2011, Plaintiff filed an opposition.  Doc. 51.  After an extension of time, on August 22, 2011, Defendants filed evidentiary objections to Plaintiff's opposition.  Doc. 58.  On September 12, 2011, Plaintiff filed a reply to Defendants' evidentiary objections.  Doc. 63.  Plaintiff's supplemental brief filed on August 11, 2011, (Doc. 54) and supplemental declaration filed August 22, 2011, (Doc. 59) were stricken from the record.  Doc. 69.

## II.    Facts

### A.    Background

Serious constitutional violations have persisted in California's prison system as a result of prison overcrowding.  *Brown v. Plata*, 131 S. Ct. 1910, 1922-24 (2011).[2]  "The degree of overcrowding in California's prisons is exceptional. . . . The State's prisons had operated at around 200% of design capacity for at least 11 years."  *Plata*, 131 S. Ct. at 1923-24.  After the State of California failed to comply withe the remedial injunction set out by the trial court in *Plata v. Brown*, in 2005 the court appointed a Receiver to oversee remedial efforts and correct the ongoing Constitutional violations.  *Plata*, 131 S. Ct. at 1926.  In 2006, the then governor of California issued a declaration of a state of emergency in the prisons, stating that 'immediate action is necessary to prevent death and harm caused by California's severe prison overcrowding.'  *Plata*, 131 S. Ct. at

---

[2] The Court takes judicial notice of *Brown v. Plata*, 131 S. Ct. 1910, 1922-24 (2011) and the court records in that case.  Fed. R. Evid. 201(d); *see United States v. Howard*, 381 F.3d 873, 876 n.1 (2004).

1924 (citing Juris. Statement App., O.T.2009, No. 09-416, p. 61a) (internal quotation marks omitted); *Plata*, 131 S. Ct. 1910, Joint Appendix, Vol. V/VI, 2010 WL 5173202 at *1703 (California Declaration of State Emergency in Prisons).  "Overcrowding . . . led to rising prison violence and greater reliance by custodial staff on lockdowns . . . ." *Plata*, 131 S. Ct. at 1924 (citing App. 1037) (Receiver's Report); *see also Plata*, 131 S. Ct. 1910, Joint Appendix, Vol. V/VI (Expert Panel on Adult Offender Recidivism Reduction Programming Report to the California State Legislature), 2010 WL 5173202 at *1714, 1747-48.  With its observation that "[i]ncreased violence also requires increased reliance on lockdowns to keep order . . . ." the Supreme Court noted that "[i]n 2006, prison officials instituted 449 lockdowns. The average lockdown lasted 12 days, and 20 lockdowns lasted 60 days or longer." *Plata*, 131 S. Ct. at 1934 (internal citations omitted).

In 2006, the California Substance Abuse and Treatment Facility (CSATF) experienced "120 incidents of assault/battery by inmates - 53 of them against CDCR staff - along with 20 riots/melees, and 124 weapon confiscations." *Plata*, 131 S. Ct. 1910, Joint Appendix, Vol. V/VI, 2010 WL 5173202 at *1700 (California Declaration of State Emergency in Prisons).  In the summer of 2008, although "[CSATF] was designed to hold 3,424 prisoners . . . the total population as of August 20 was 7,121, i.e., 208% of design capacity." Plata, 131 S. Ct. 1910, Joint Appendix, Vol. V/VI , 2010 WL 5173202 at *1386 (Second Supplemental Expert Report of Ronald M. Shansky, M.D.).[3]

Within this prison landscape, Plaintiff has brought three actions in addition to this present action to address repeatedly being placed on lockdown, usually race-based lockdowns, and suffering

---

[3] *See also*, Department of Corrections and Rehabilitation, Month Report of Population as of Midnight August 31, 2008, at * 2, http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_Branch/ Monthly/TPOP1A/TPOP1Ad0808.pdf.

extended periods of being denied outdoor exercise[4] as a result of these lockdowns.[5]  After over

fifteen months of lockdown related denial of exercise at three different prisons,[6] Plaintiff brings this

current action.  The events relevant to Plaintiff's complaint occurred while Plaintiff was a state

prisoner at the California Substance Abuse and Treatment Facility (CSATF).  Doc. 10 at 3; Doc. 45-

1 at 8.

Plaintiff is an African-American, fifty-year old, inmate with no known history of violence

during his eighteen years of incarceration and not affiliated with any gangs.  Doc. 51 at 23, 55, 66;

Doc. 51 at 68, 74 (Pltf's Decl.).  Plaintiff has even been placed in administrative segregation because

he refuses to be housed with a gang member.  Doc. 51 at 69 (Pltf's Decl.).  Currently, Plaintiff is

---

[4] Although the Court will use the broader term of "outdoor exercise," it appears from the facts that Plaintiff was not only denied "outdoor exercise," but more precisely, Plaintiff was also denied "out-of-cell" exercise with the minor exception of being allowed to walk escorted to take a daily shower.  Whether to distinguish out-of-cell exercise from outdoor exercise varies.  *E.g.*, *Thomas v. Ponder*, 611 F.3d 1144, 1146-55 (9th Cir. 2010); *Fogle v. Pierson*, 435 F.3d 1252, 1260 n.4 (10th Cir. 2006) (finding that the district court erred as a matter of law in concluding that a prisoner must allege denial of all exercise, not just outdoor exercise where prisoner was "allowed access to a cell with a pull-up bar a few times each week."); *Perkins v. Kansas Dep't of Corrections*, 165 F.3d 803, 809-10 (10th Cir. 1999) (although labeled as a "claim for deprivation of outdoor exercise," prisoner was "permitted to leave his cell for thirty minutes each day, to take a shower ... [and was not] permitted to exercise outside his cell for over a year."); *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir.1996) (finding Eighth Amendment violation where prisoner was deprived of out-of-cell exercise except for a daily walk to a shower.); *Wilkerson v. Maggio*, 703 F.2d 909, 911-12 (5th Cir.1983) (noting that prisoner was permitted to exercise regularly in a room that was "about thirty yards long" and was "lined with windows which permitted fresh air to enter the cell block area.").

[5] The Court takes judicial notice of *Norwood v. Alameida, et al.*, 2:03-cv-02554-GEB-GGH (appellate case *Norwood v. Vance*, 591 F.3d 1062 (9th Cir. 2010); *Norwood v. Woodford, et al.*, 3:07-cv-00057-WQH-JMA (appellate case No. 09-56969, referred to mediation and settled); *Norwood v. Tilton et al.*, 1:08-cv-00059-AWI-GBC.  Fed. R. Evid. 201(d); *see United States v. Howard*, 381 F.3d 873, 876 n.1 (2004).

[6] While incarcerated at CSP-Sacramento, in early 2002, Plaintiff was denied exercise for approximately three months due to a lockdown in response to eleven Hispanic inmates attacking four correctional officers. *Norwood v. Vance*, 591 F.3d 1062, 1065 (9th Cir. 2010).  As a result of an African-American inmate stabbing an officer in early May of 2002 and additional attacks on officers, Plaintiff was denied exercise for an additional three months during the prison lockdown.  *Norwood v. Vance*, 591 F.3d 1062, 1065 (9th Cir. 2010).  Towards the end of 2002, a murder attempt on a correctional officer by African-American inmates resulted in Plaintiff being denied exercise for four and a half months.  In September of 2003, an African-American Crip attempted to murder a correctional officer and Plaintiff was denied exercise for two more months during the resulting lockdown.  *Norwood v. Vance*, 591 F.3d 1062, 1065-66 (9th Cir. 2010).  While incarcerated at CSP-Corcoran, Plaintiff was denied exercise 39 days as a result of a lockdown is response to "multiple assaults of attempted murders of correctional staff . . . . "  *Norwood v. Woodford, et al.*, 3:07-cv-00057 (Doc. 122 at 3-4).  While incarcerated at the California Substance Abuse and Treatment Facility (CSATF), Plaintiff  was denied outdoor exercise from October 7, 2006, to February 3, 2007.  *Norwood v. Tilton et al.*, 1:08-cv-00059 (Doc. 21 at 2-3).

incarcerated at Calipatria State Prison.  Doc. 22; Doc. 45-1 at 8.  Defendants Clark, Allison, Wan, Reynoso and Sullivan were employed at CSATF during the time relevant to the allegations of this action.  Doc. 45-1 at 14-15.  Defendant Clark, in his capacity as Warden at CSATF implemented, adjusted, and terminated the lockdowns at issue in this action.  Doc. 45-1 at 14.

On July 25, 2008, a riot occurred on a Facility C recreation yard, involving approximately twenty-two African-American inmates and six Caucasian inmates which resulted in a race-based "lockdown" (or a "modified program"[7]) of African-American and Caucasian inmates which lasted ninety-two (92) days, ending on October 25, 2008.  Doc 45-1 at 7; Doc. 45-1 at 15 (citing Doc. 46-1 (Clark Decl. ¶ 37a); Doc. 46-2 Allison Decl. ¶ 37a, Ex. A p. 1).  Although Plaintiff was not involved in any of the prison violence, Plaintiff was deprived outdoor exercise during the lockdown which lasted ninety-two days.  Doc. 46-7 (Alves Decl., Ex. A at 27:13-22, 40:14-16, 41:10-11 (Excerpt from Norwood Depo.)).  Less than a month later, as a result of a battery of an African-American inmate by two Caucasian inmates on November 18, 2008, CSATF was a placed on a race-based lockdown for seventy-two (72) days.  Doc. 45-1 at 7; Doc. 45-1 at 7.  Although Plaintiff was not involved in any of the prison violence, Plaintiff was denied outdoor exercise during the entire seventy-two day lockdown.  Doc. 46-1 (Clark Decl. ¶ 37w); Doc. 46-2 (Allison Decl. ¶ 37w, Ex. A p. 55.).

### B.   Defendants' Description of Prison's Lockdown Procedure

According to Defendants, lockdowns are imposed in response to serious threats to institutional security and the safety of inmates and staff.  Doc. 45-1 at 9.  In a prison setting, lockdowns are necessary when correctional officers discover evidence or receive information that

---

[7] Whether they are called lockdowns or modified programs is immaterial to the resolution of Plaintiff's claim.  What is material is whether Plaintiff was deprived of exercise for a period of time sufficient to implicate the Eighth Amendment and if so, whether Defendants acted with deliberate indifference.  Neither party disputes that outdoor exercise was suspended and it is that condition of confinement which is at issue here.

violence or disruptions are being planned by some inmates against other inmates or staff.  Doc. 46-1 (Clark Decl. ¶ 9); Doc. 46-2 (Allison Decl. ¶ 9); Doc. 46-4 (Wan Decl. ¶ 9); Doc. 46-5 (Reynoso Decl. ¶ 9).   California Department of Corrections and Rehabilitation ("CDCR") policies and procedures direct that when a serious incident occurs, the priorities are: 1) isolate, contain, and control the situation to the smallest possible area; 2) provide medical attention to all injured persons; 3) preserve all available evidence; 4) identify all involved persons; and 5) complete and submit appropriate written documentation and reports within the designated time frames.  Doc. 46-1 (Clark Decl. ¶ 9); Doc. 46-2 (Allison Decl. ¶ 9); Doc. 46-4 (Wan Decl. ¶ 9); Doc. 46-5 (Reynoso Decl. ¶ 9).  After the initial incident response is completed, the incident is assessed and programming is determined.  Doc. 46-1 (Clark Decl. ¶ 11); Doc. 46-2 (Allison Decl. ¶ 11); Doc. 46-4 (Wan Decl. ¶ 11); Doc. 46-5 (Reynoso Decl. ¶ 11).  If the incident is serious, it may be necessary to restrict program activities for some or all of the inmates by: 1) declaring a State of Emergency; 2) locking down an entire facility or portions of a facility; or 3) placing some or all of the facility on lockdown. Doc. 46-1 (Clark Decl. ¶ 11); Doc. 46-2 (Allison Decl. ¶ 11); Doc. 46-4 (Wan Decl. ¶ 11); Doc. 46-5 (Reynoso Decl. ¶ 11).

Defendants assert that during lockdown, current safety concerns, and the duty to investigate and to determine the causes of the disturbances or acts of violence, compel prison officials to enforce restrictions within the facility, which may include: suspension of outdoor exercise; canteen; telephone; and regular visits.  Doc. 46-1 (Clark Decl. ¶ 10); Doc. 46-2 (Allison Decl. ¶ 10); Doc. 46-4 (Wan Decl. ¶ 10); Doc. 46-5 (Reynoso Decl. ¶ 10).  Once a lockdown is declared, the process of investigating and gathering intelligence begins.  Doc. 46-1 (Clark Decl. ¶ 18); Doc. 46-2 (Allison Decl. ¶ 18); Doc. 46-4 (Wan Decl. ¶ 18); Doc. 46-5 (Reynoso Decl. ¶ 18).  The facility is searched, including the yards, cells, common areas, and other areas, for evidence, weapons, and contraband.

*Id.* Facility staff and inmates are interviewed to gather intelligence about the incident and to determine whether it is safe to return to normal programming. *Id.* During the investigation, staff communicate regularly with other institutions and CDCR headquarters to determine whether it is safe to return to normal programming. Doc. 46-1 (Clark Decl. ¶ 20); Doc. 46-2 (Allison Decl. ¶ 20); Doc. 46-4 (Wan Decl. ¶ 20); Doc. 46-5 (Reynoso Decl. ¶ 20).

CDCR's policy is to return to normal programming when it is safe to do so. Doc. 46-1 (Clark Decl. ¶¶ 17-18, 20-21); Doc. 46-2 (Allison Decl. ¶¶ 17-18, 20-21); Doc. 46-4 (Wan Decl. ¶¶ 17-18, 20-21); Doc. 46-5 (Reynoso Decl. ¶¶ 17-18, 20-21). When it is deemed appropriate, an incremental unlock plan is developed to return to normal operations. Doc. 46-1 (Clark Decl. ¶ 17); Doc. 46-2 (Allison Decl. ¶ 17); Doc. 46-4 (Wan Decl. ¶ 17); Doc. 46-5 (Reynoso Decl. ¶ 17). Small groups of inmates may be released so staff can observe their conduct in a controlled environment and evaluate whether the planned unlock can proceed safely. *Id.* If another incident occurs during the unlock process, previously released inmates may be locked down again so an investigation of the new incident can be completed. Doc. 46-1 (Clark Decl. ¶ 27); Doc. 46-2 (Allison Decl. ¶ 27); Doc. 46-4 (Wan Decl. ¶ 27); Doc. 46-5 (Reynoso Decl. ¶ 27). If it is determined that returning to regular programming would pose too great a risk, the lockdown may be continued. *Id.*

During a lockdown, there are weekly mandatory meetings with the Warden or Chief Deputy Warden, the Facility Captain, the Associate Warden, the Use of Force Coordinator, and any line staff member with relevant information. Doc. 46-1 (Clark Decl. ¶ 20); Doc. 46-2 (Allison Decl. ¶ 20); Doc. 46-4 (Wan Decl. ¶ 20); Doc. 46-5 (Reynoso Decl. ¶ 20). The attendees discuss the progress of the investigation, the status of the programming, and the development of a plan to resume normal programming. *Id.* The Associate Director of Institutions is apprised of the status via weekly reports and bi-weekly conference calls. *Id.*

Of all the normal programming activities suspended during lockdown, it is most difficult to determine when outdoor exercise programs can safely be resumed. Doc. 46-1 (Clark Decl. ¶ 24); Doc. 46-2 (Allison Decl. ¶ 24); Doc. 46-4 (Wan Decl. ¶ 24); Doc. 46-5 (Reynoso Decl. ¶ 24). Because inmates have the greatest access to each other on the exercise yards, that is typically where most inmate-on-inmate assaults occur. *Id.* In determining when and how to safely resume outdoor exercise programs after a lockdown, Defendants had to consider numerous factors, including that during normal programming, the number of inmates on a yard greatly outnumbered prison staff assigned to monitor them and the self-imposed racial divisions that caused the underlying lockdown could trigger further violence, especially since various racial groups claim different areas of the yard as their turf. *Id.*

### C.     Implementation and Continuance of the July 25, 2008, Lockdown

According to Defendants, on July 25, 2008, a riot occurred on a Facility C recreation yard, involving approximately twenty-two African-American inmates and six Caucasian inmates. Doc. 46-1 (Clark Decl. ¶ 37a); Doc. 46-2 (Allison Decl. ¶ 37a, Ex. A p. 1). Responding staff needed pepper spray to stop the incident. *Id.* Due the magnitude of the incident, additional staff from other facilities was called in to stop the violence. *Id.* One inmate was transported to an outside hospital for further medical treatment due to serious bodily injuries. *Id.* During the search of the crime scene, staff found an inmate-manufactured weapon. *Id.* Prison officials at CSATF concluded that normal programming activities posed an unacceptable risk of renewed violence until the causes of the violence were investigated and resolved. *Id.* Thus, all of the inmates in Facility C were immediately placed on lockdown to protect both inmates and staff from serious bodily injuries or death. *Id.*

On July 25, 2008, a lockdown meeting was held, and correctional staff determined that it was

necessary to search the entire facility and interview inmates to assess the cause of the violence and locate any additional weapons, weapons stock, or other contraband. Doc. 46-1 (Clark Decl. ¶ 37b); Doc. 46-2 (Allison Decl. ¶ 37b, Ex. A p. 2). On July 29, 2008, correctional counselors began the process of interviewing approximately 125 Facility C inmates. Doc. 46-1 (Clark Decl. ¶ 37c); Doc. 46-2 (Allison Decl. ¶ 37c, Ex. A p. 4). On August 12, 2008, correctional staff completed the search of Facility C, which resulted in the discovery and confiscation of approximately seven inmate-manufactured weapons. Doc. 46-1 (Clark Decl. ¶ 37d); Doc. 46-2 (Allison Decl. ¶ 37d). On August 13, 2008, the initial searches and interviews in Facility C were completed. Doc. 46-1 (Clark Decl. ¶ 37e); Doc. 46-2 (Allison Decl. ¶ 37e, Ex. A p. 7).

Through the interviews, staff learned that the riot stemmed from an unidentified group of Caucasian inmates not wanting a new Caucasian inmate, who was affiliated with the "Crips" street gang, to associate with them. *Id.* Accordingly, on July 25, 2008, two Caucasian inmates attempted to assault the new Caucasian inmate on the recreation yard. *Id.* African-American inmates intervened and attacked the two Caucasian inmates. *Id.* At which point, other Caucasian inmates rushed to the scene and started to attack the African-American inmates, which led to a riot between approximately twenty-eight inmates. *Id.* Based on the fact that the race riot only involved Caucasian and African-American inmates, all other inmates were allowed access to dayroom activities and telephone calls. *Id.*

On August 14, 2008, correctional staff members met with members of the Inmate Advisory Committee (IAC). Doc. 46-1 (Clark Decl. ¶ 37f); Doc. 46-2 (Allison Decl. ¶ 37f, Ex. A p. 8). Although the IAC representatives advised staff that they believed the inmate population was ready to safely return to normal programming, correctional staff, received conflicting reports from other inmates that unidentified members of the Caucasian and African-American inmate populations were

"stand-offish," and posed a serious threat of retaliatory or continued violence. *Id.* Based upon the continued threat of violence, Caucasian and African-American inmates in Facility C remained on lockdown, pending the continuing efforts to assess, identify, and remove the cause of the violence. *Id.*

On August 19, 2008, inmates other than the Caucasian and African-American inmates started using the canteen and quarterly packages. Doc. 46-2 (Allison Decl. at Ex. A p. 9). On August 21, 2008, based on the safe and successful reinstatement of some normal programming activities for those inmates, CSATF began the incremental restoration of their outdoor exercise program. Doc. 46-2 (Allison Decl. at Ex. A p. 10). On August 23, 2008, correctional counselors completed a second round of interviews, with approximately ninety inmates in Facility C, as they attempted to assess whether there was continued tension between Caucasian and African-American inmates. Doc. 46-1 (Clark Decl. ¶ 37g); Doc. 46-2 (Allison Decl. ¶ 37g). On August 25, 2008, outdoor exercise programs were expanded for Hispanic and "Other" inmates. Doc. 46-2 (Allison Decl. at Ex. A p. 11).

In order to diffuse tensions and disseminate facts regarding the reasons for the lockdown, Caucasian and African-American IAC representatives were permitted restrained access to the housing units in Facility C. *Id.* On August 27, 2008, all inmates other than the two groups involved in the race riot began to return to a normal program. Doc. 46-2 (Allison Decl. at Ex. A p. 11). On approximately August 27, 2008, two Southern Hispanic inmates advised correctional staff that there was continued tension between Caucasian and African-American inmates. Doc. 46-1 (Clark Decl. ¶ 37h); Doc. 46-2 (Allison Decl. ¶ 37h). According to Defendants, one of the reporting inmates claimed that a prisoner at another prison wrote him a letter that warned him to stay out of the conflict between Caucasian and African-American inmates. *Id.* Correctional staff investigated these claims,

including contacting several prisons to assess the risk of renewed violence, but the investigation did not reveal any evidence of a letter being processed to the reporting inmate. *Id.*

On August 29, 2008, Caucasian and African-American IAC representatives safely interacted with each other at an IAC meeting. Doc. 46-1 (Clark Decl. ¶ 37i); Doc. 46-2 (Allison Decl. ¶ 37i). On September 3, 2008, officials began the calculated release of Caucasian and African-American inmates to normal programming starting with a small and equal number of Caucasian and African-American inmates returning to work, and IAC members meeting without mechanical restraints. Doc. 46-1 (Clark Decl. ¶ 37j); Doc. 46-2 (Allison Decl. ¶ 37j, Ex. A p. 14). On September 4, 2008, the first IAC meeting occurred without incident. Doc. 46-1 (Clark Decl. ¶ 37k); Doc. 46-2 (Allison Decl. ¶ 37k, Ex. A p. 15). Then officials allowed Caucasian and African-American inmates to began using canteen and quarterly packages. *Id.* In addition, IAC members were permitted to travel unrestrained between housing units to disseminate the facts regarding the lockdown and restoration of normal programming activities to the inmate population. *Id.*

During the IAC meetings, Caucasian and African-American IAC representatives advised staff that the lockdown helped defuse the tension between the Caucasian and African-American inmate population. *Id.* On September 8, 2008, Caucasian and African-American critical workers returned to their jobs in the laundry, education, and law library. Doc. 46-2 (Allison Decl. at Ex. A, p. 16). On September 9, 2008, Hispanic and "Other" inmates returned to a normal program. Doc. 46-2 (Allison Decl. at Ex. A, p. 17). On September 11, 2008, Caucasian and African-American inmates began reporting to work and medical appointments unrestrained. Doc. 46-2 (Allison Decl. at Ex. A, p. 18). On September 15, 2008, Caucasian and African-American inmates started traveling to the showers escorted but unrestrained. Doc. 46-2 (Allison Decl. at Ex. A, p. 19).

The next day, the Investigative Services Unit intercepted a letter from an African-American inmate indicating there was still a lot of racial tension between Caucasian and African-American inmates, and if the lockdown ended, there would be fighting between the two groups.  Doc. 46-1 (Clark Decl. ¶ 37l); Doc. 46-2 (Allison Decl. ¶ 37l, Ex. A pp. 22, 24).  Based on this information, all of the inmates in Facility C were placed back on lockdown until staff could identify and assess the threat of violence.  *Id.*  Correctional staff initiated a new series of interviews and searches, which later resulted in the discovery of weapons, weapons stock, and cellular phones.  *Id.*  Based upon the information gathered during the investigation, on October 22, 2008, the lockdown was modified to restore recreational yard and visiting for all inmates, except for the Caucasian inmate population. Doc. 46-2 (Allison Decl. at Ex. A p. 26).  On October 25, 2008, Plaintiff outdoor exercise was restored.  Doc. 46-7 (Alves Decl., Ex. A at 27:13-22, 40:14-16, 41:10-11 (Excerpt from Norwood Depo.)).  On November 12, 2008, correctional staff began the calculated progressive release of Caucasian inmates starting with dayroom activities.  Doc. 46-1 (Clark Decl. ¶ 37j); Doc. 46-2 to 46-3 (Allison Decl. ¶ 37j, Ex. A pp. 30-35).   Then on November 17, 2008, Caucasian and African-American inmates began to program together during dayroom activities, telephone calls, and contact visits.  Doc. 46-7 (Alves Decl., Ex. A at 42:5-6 (Excerpt from Norwood Depo.); Doc. 46-2 (Allison Decl., Ex. A p. 35).

### D.   Implementation and Continuance of the November 18, 2008, Lockdown

On November 18, 2008, shortly after the release to the dayroom in Building C8, two Caucasian inmates committed a battery of an African-American inmate, using a wooden cane.  Doc. 46-1 (Clark Decl. ¶ 37n); Doc. 46-2 (Allison Decl. ¶ 37n, Ex. A p. 36).  The African-American inmate sustained multiple puncture wounds on his back, chest, and arms, requiring treatment at an outside hospital.  *Id.*  Correctional staff determined that a lockdown and an investigation was

necessary to assess the cause of the violence, the number of inmates planning violence, and whether this was an isolated incident or part of a larger campaign of organized violence. *Id.* By November 22, 2008, correctional staff completed 143 interviews and a search of the entire facility, which produced several inmate-manufactured weapons and two cellular telephones. Doc. 46-1 (Clark Decl. ¶ 37p); Doc. 46-2 (Allison Decl. ¶ 37p). Through the interview process, correctional staff discovered that many inmates misunderstood the facts regarding the November 18, 2008 assault, based upon false rumors. *Id.* Based upon the misunderstandings, correctional staff were concerned that an unidentified number of African-American inmates might be planning retaliatory acts of violence against the Caucasian inmates. *Id.* Accordingly, correctional staff investigated the threat and started working with the IAC to dispel the false rumors, diffuse any tensions, and maintain an avenue for communicating with all of the inmate population. *Id.* On December 3, 2008, Hispanic and "Other" inmates returned to normal program. Doc. 46-3 (Allison Decl. at Ex. A, p. 51). On December 3, 2008, prison staff intercepted a note congratulating the two assailants for their successful battery on an African-American inmate. Doc. 46-1 (Clark Decl. ¶ 37p); Doc. 46-2 (Allison Decl. ¶ 37p). Caucasian and African-American inmates were allowed separate canteen, quarterly packages, and non-contact visits in restraints. *Id.* On December 7, 2008, prison staff received evidence that an unidentified group of African-American inmates were targeting an unidentified group of Caucasian inmates for a retaliatory assault. Doc. 46-3 (Allison Decl. at Ex. A, p. 51). A week later, prison staff intercepted a letter from an African-American inmate stating that Caucasian and African-American inmates were headed toward a "full blown race war" and subsequent interviews confirmed the tensions between the Caucasian and African-American inmate population, but staff could not confirm that African-American inmates were organizing coordinated acts of violence. Doc. 46-1 (Clark Decl. ¶ 37q); Doc. 46-2 (Allison Decl. ¶ 37q).

On December 17, 2008, Caucasian and African-American inmates, age forty-five and older, started using the showers and attending medical appointments unescorted.  Doc. 46-3 (Allison Decl. at Ex. A, p. 44).  On December 23, 2008, Caucasian and African-American inmates, age thirty-five and older, were permitted to move unrestrained during daily activities.  Doc. 46-3 (Allison Decl. at Ex. A, p. 46).  But due the continued risk of violence, outdoor exercise or dayroom activities were not restored for either Caucasian or African-American inmates.  *Id.*  On December 24, 2008, a physical altercation occurred between Caucasian and African-American inmates in a holding cell in the Facility C medical clinic.  Doc. 46-3 (Allison Decl. at Ex. A, pp. 47-50).  Due to the altercation in the medical clinic, Caucasian and African-American inmate populations were both placed back on a full lockdown while the nature, extent, and scope of the violence was investigated.  *Id.*  On January 9, 2009, the Caucasian IAC representative told the African-American IAC representative that the December 24, 2008, incident in the Facility C medical clinic, was not sanctioned, and the Caucasian assailant acted on his own accord.  Doc. 46-1 (Clark Decl. ¶ 37r); Doc. 46-2 (Allison Decl. ¶ 37r).

On January 13, 2009, staff prepared to release Caucasian and African-American inmates, ages forty-years and older, to the recreation yard, however, that day a note was intercepted that said that the Caucasian and African-American inmates in Building C5 were going to "go off" during recreational yard.  Doc. 46-1 (Clark Decl. ¶ 37s); Doc. 46-2 (Allison Decl. ¶ 37s).  Additionally, staff discovered evidence that indicated two African-American inmates were filing metal into weapons.  *Id.*  As a result of the above mentioned information that was gathered, plans to allow inmates on the recreation yard were rescinded, and staff began another investigation regarding the continued threat of violence between the Caucasian and African-American inmate population.  *Id.*  During the investigation, staff received reports that several African-American inmates were promoting racial

tension in building C3.  Doc. 46-1 (Clark Decl. ¶ 37t); Doc. 46-2 (Allison Decl. ¶ 37t).  On January 14, 2009, the staff learned the identity of two inmates suspected of promoting racial tension, and they were removed from the general population and placed in the prison's administrative segregation unit. *Id.*

On January 21, 2009, during a supervised IAC meeting, the Caucasian IAC representative battered the African-American IAC representative without any provocation.  Doc. 46-3 (Allison Decl. at Ex. A, p. 54.  Then, on January 23, 2009, staff received a note that said an unidentified group of Caucasian inmates were planning to assault African-American inmates as soon as the modified program was lifted.  Doc. 46-1 (Clark Decl. ¶ 37u); Doc. 46-2 (Allison Decl. ¶ 37u).  A day later, staff overheard a Caucasian inmate tell someone that Caucasian inmates would attack African-American inmates whenever they had the opportunity because they were outnumbered.  Doc. 46-1 (Clark Decl. ¶ 37v); Doc. 46-2 (Allison Decl. ¶ 37v).  On January 26, 2009, based upon the totality of information gathered by correctional staff, it was determined that an unidentified group of Caucasian inmates were the aggressors, and Caucasian and African-American inmates could not safely program together.  Doc. 46-1 (Clark Decl. ¶ 37w); Doc. 46-2 (Allison Decl. ¶ 37w). Therefore, on January 27, 2009, African-American inmates (which included Plaintiff) returned to normal program, and Caucasian inmates remained on lockdown as staff continued to investigate and search for the unidentified inmates planning and promoting violence.  *Id.*

## III.    Defendants' Motion for Summary Judgment

Defendants present four main arguments: 1) Defendants Allison, Wan, and Reynoso did not "cause" Plaintiff's alleged injury as required for § 1983 liability, because they did not control the duration or scope of the lockdowns; 2) all of the defendants are entitled to summary judgment

because the temporary restrictions on Plaintiff's access to outdoor exercise were reasonable measures taken in response to particularized and credible threats to institutional safety and security, and thus, did not violate Plaintiff's Eighth Amendment rights; 3) alternatively, all defendants are entitled to qualified immunity from damages because there was no clearly established right which a reasonable correctional official would have known they were violating; and 4) Plaintiff's claims for injunctive relief are moot.  Doc. 45-1 at 8.

### A.    Causation as to Defendants Allison, Wan, and Reynoso

Defendants argue that judgment should be in favor of Defendants Allison, Wan, and Reynoso because they did not "cause" Plaintiff's alleged injury as required for § 1983 liability, since they did not control the duration or scope of the lockdowns.  Doc. 45-1 at 8.  Defendants assert that at all times relevant to this suit, Defendant Clark was the only correctional staff member at CSATF with the authority to modify or terminate the modified programs.  Doc. 46-1 (Clark Decl. ¶¶ 2-6); Doc. 46-2 (Allison Decl. ¶¶ 2-6).  During times relevant to this action, Defendant Clark implemented, adjusted, and terminated the lockdowns at CSATF.  Doc. 46-1 (Clark Decl. ¶¶ 2-6); Doc. 46-2 (Allison Decl. ¶¶ 3, 6).

Defendant Allison was the Chief Deputy Warden at CSATF.  Doc. 46-2 (Allison Decl. ¶ 1). Defendants assert that while Defendant Allison was delegated with the approval of Program Status Reports for the modified programs, she was not delegated with or designated by Warden Clark to make decisions on adjustments to or terminations of the lockdowns at issue in this case.  Doc. 46-1 (Clark Decl. ¶ 5); Doc. 46-2 (Allison Decl. ¶ 2).

Defendant Wan was an Associate Warden at CSATF.  Doc. 46-4 (Wan Decl. ¶ 1).  With respect to the lockdowns at issue, Defendant Wan participated in bi-weekly meetings to discuss the progress of investigations into the incidents that triggered the modified programs, the status of the

modified program, and the development of a plan to resume normal programming. Doc. 46-1 (Clark Decl. ¶¶ 2-6); Doc. 46-4 (Wan Decl. ¶ 5). Defendant Wan did not have the authority to decide whether to adjust or terminate the modified programs. *Id.*

Defendant Reynoso was the Facility Captain for Facility C at CSATF, where the Plaintiff was housed. Doc. 46-5 (Reynoso Decl. ¶ 1). Defendant Reynoso participated in bi-weekly meetings to report on operations in the facility where the modified program was in place, and to discuss the progress of investigations, and the development of a plan to resume normal programming. Doc. 46-1 (Clark Decl. ¶¶ 2-6); Doc. 46-5 (Reynoso Decl. ¶¶ 3-6). Defendant Reynoso also prepared the Program Status Reports which advised staff and inmates on the status of the modified programs, based on information dictated by Warden Clark, which reports would then be approved by Defendant Allison. Doc. 46-5 (Reynoso Decl. ¶¶ 3-6). Defendant Reynoso did not have the authority to adjust or terminate the modified programs. Doc. 46-1 (Clark Decl. ¶¶ 2-6); Doc. 46-5 (Reynoso Decl. ¶¶ 3-6).

As an Associate Director of Institutions, Defendant Sullivan was apprised of the conclusions and supporting facts of correctional staff at the prisons, including CSATF, through weekly Program Status Reports and bi-weekly conference calls in which he would participate. Doc. 46-6 (Sullivan Decl. ¶¶ 2-3). According to Defendant Sullivan's declaration, during the lockdown process at CSATF in 2008, Defendant Sullivan relied upon the investigations, analysis, and opinions of the staff at CSATF. *Id.*

### B.     Subjective Prong to Eighth Amendment Deliberate Indifference

Defendants assert that "[b]ecause the Defendants' obligation to maintain order and protect inmates and staff from assaults takes precedence over the prison's outdoor exercise programs, and the reasonable measures they took through the [lockdowns] fulfilled that obligation, [Plaintiff]'s

rights under the Eighth Amendment were not violated here." Doc. 45-1 at 29.  Defendants assert that Plaintiff's main argument is that Plaintiff should have been released from lockdown restrictions immediately after correctional staff had concluded their interview of him.  Doc. 45-1 at 7.  Although Plaintiff's argument is that the length of the lockdown period provides sufficient indicia of malice to satisfy the subjective prong of the deliberate indifference test, Defendants argue that such argument:

> . . . ignores the deference afforded correctional officials in their judgment as to how best to restore order to their prisons when violence occurs . . . . [and that] Plaintiff's theory also ignores that there is no controlling case that specifies how long a lockdown . . . can be continued before it rises to the level of an Eighth Amendment violation, or what the monitoring process must be in order for the lockdown or modified program to remain in place.

Doc. 45-1 at 7.  Contrary to Plaintiff's assertions, Defendants argue that the lockdowns on July 25, 2008, and November 18, 2008, were: 1) not in excess of what was required to restore order; 2) were related to officials' security and safety duties; and 3) did not last for a time period that was longer than necessary to restore order and security.  Doc. 45-1 at 7-8.

### C.     Qualified Immunity

Defendants argue that all of the defendants are entitled to summary judgment because all defendants are entitled to qualified immunity from damages because there was no clearly established right which a reasonable correctional official would have known they were violating.  Doc. 45-1 at 8, 28-32.

### D.     Mootness of Injunctive Relief

Defendants argue that Plaintiff's claims for injunctive relief are moot.  Doc. 45-1 at 8. According to Defendants, Norwood is incarcerated at Calipatria State Prison.  Doc. 46-7 at 22 (Alves Decl. at Ex. A, 63:13-16 (Excerpt of Plaintiff's Declaration)).  Defendants assert that they do not have any authority or control over Norwood or the day-to-day operations of Calipatria State Prison.

Doc. 45-1 at 8.  Doc. 46-6 (Sullivan Decl. ¶ 1); Doc. 46-1 (Clark Decl. ¶ 1); Doc. 46-2 (Allison Decl. ¶ 42); Doc. 46-4 (Wan Decl. ¶ 42); Doc. 46-5 (Reynoso Decl. ¶ 1).

## IV.    Plaintiff's Opposition

In his opposition, Plaintiff argues that: 1) since Defendants did not remove from the general population a Caucasian "Crip" inmate named Brandon Johnston, Defendants "staged and provoked" the July 25, 2008, race riot which led to the lockdown and resulted in Plaintiff not having outdoor exercise; 2) the length of time that it took for Defendants to investigate the July 25, 2008, outbreak of violence was a pretext since Defendants knew the cause of the violence before it occurred; 3) Defendants had an alternate means of providing outdoor exercise to prisoners through the mini concrete segregated housing unit yards, however, chose not to use them; 4) it is disputed what time Defendants first knew that Caucasian inmates were ordered to assault African-American inmates; 5) Defendants knew that Caucasian inmates would attack African-American inmates and Defendants should not have continued to allow both races to interact; 6) Defendants found an African-American inmate guilty in a disciplinary hearing and sent him to administrative segregation as a means of covering up the fact that they knew Caucasian inmates were the aggressors yet pretended they did not know who was the aggressor in order to justify continuing lockdown-based investigations.  Doc. 51 at 1-2, 55, 58; Doc. 51 at 75-77 (Pltf's Decl.).  Plaintiff argues that Defendants' response in investigating the violence was deliberately "exaggerated" for the purpose of inflicting harm to inmates by suspending their outdoor exercise.  Doc. 51 at 2-3.

### A.    Discovery-Based Arguments

Plaintiff argues that if his prior motions to compel were granted, he would be able to prove that Defendants knew ahead of time that a Caucasian Crip was going to cause a race riot and thus

demonstrate that Defendants were deliberately indifferent to Plaintiff's right to outdoor exercise. Doc. 51 at 3, 58, 64. As evidence, Plaintiff attaches a declaration from inmate Jones. Doc. 51 at Pltf's Ex. C (Jones Decl.).[8] For example, Plaintiff argues that some of his interrogatory requests, if fulfilled, would demonstrate that Defendants interviewed the Caucasian Crip inmate prior to the July 25, 2008, race riot and would demonstrate that they knew such an outbreak of violence would occur. Doc. 51 at 3, 58, 64. Plaintiff also argues that his request to view the videotape of the July 25, 2008, race riot would demonstrate that Defendants did not need a prolonged lockdown to carry-out additional investigation to determine the cause of the incident since the video makes the cause evident. Doc. 51 at 3. Plaintiff also argues that if the requested discovery was granted, he would be able to prove that on September 19, 2008, and between July 25, 2008, and February 1, 2009, various Caucasian inmates who refused to attack an African-American inmate sought protective custody out of fear of retaliation from other Caucasian inmates. Doc. 51 at 4-5, 27, 40, 63; Doc. 51 at 73 (Pltf's Declaration). Plaintiff asserts that he personally knew one of the Caucasian inmates who sought protective custody status. Doc. 51 at 27, 40-41; Doc. 51 at 73 (Pltf's Decl.); Doc. 51 at Pltf's Ex. U (Interrogatory #17 wherein Defendants (without waiving objection) responded "yes" that

[8] Defendants object to Plaintiff's submission of inmate Jones' declaration and to Plaintiff's statement that he spoke to inmate Johnston several days before the racial melee broke out as inadmissible hearsay. Doc. 58. "To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001). The Court finds that although Defendants choose not to identify the name of the Caucasian Crip (which Plaintiff asserts is inmate Johnston), Defendants concede that the racial melee occurred as a result of a Caucasian Crip. Moreover, Defendants provide great detail to discuss how they investigate every rumor or informant statements regardless of whether it is true to ensure that prison staff they understand the underlying causes for tension and potential threats of violence in the prison. *See e.g.*, Doc. 46-1 (Clark Decl. ¶ 37h); Doc. 46-2 (Allison Decl. ¶ 37h). Thus, the truth of the statement is not relevant, but rather whether Defendants were on notice of, for the sake of argument, a rumor or lie regarding a Caucasian Crip prior to when the racially motivated melee occurred. *See United States v. Rogers*, 321 F.3d 1226, 1229–30 (9th Cir. 2003) (holding that a criminal complaint was admitted for the non-hearsay purpose of showing that the defendant had notice). Key to this analysis is that Jones' declaration states: ". . . upon communicating with Captain J. Reynoso . . ." Doc. 51 at Pltf's Ex. C (Jones Decl.). For example, if Jones' statements were redacted or rephrased to state that he told Defendants a lie or rumor regarding the danger of a Caucasian Crip, the same intent of demonstrating notice of the rumor would be met and would trigger a responsibility to investigate and respond accordingly.

Caucasian inmates sought protective custody); Doc. 51 at 69 (Pltf's Decl.).  Plaintiff states that at

sometime between July 20, 2008, and July 25, 2008, a Caucasian Crip named Brandon Johnston

> . . . told [Plaintiff] that he was documented as a Crip inmate and was appropriately
> housed with an African American Crip . . . [and] Captain Reynoso would not release
> him to normal program because the officials had received kites (notes) from
> Caucasian inmates stating that they were going to assault [Johnston] at first
> opportunity because he was celled with an African American and because he was
> affiliated with Crip inmates.

Doc. 51 at 69 (Pltf's Decl.).

Plaintiff asserts that another Caucasian inmate not only sought protective custody, but also

told prison staff where a stock of weapons could be found.  Doc. 51 at 40-41 (Citing to Pltf's Ex. I,

J); Doc. 51 at 60-61, 63; Doc. 51 at 73 (Pltf's Decl.).  According to Plaintiff, the fact that Caucasian

inmates were seeking protective custody would have placed Defendants on notice of a potential for

racially motivated violence and, therefore, Defendants should not have continuously released both

races together since they knew it would have caused further violence and additional lockdowns.

Doc. 51 at 4-5, 56-58, 64; Doc. 51 at 74 (Pltf's Decl.).  Plaintiff asserts that staff told Plaintiff and

other inmates that they did not know why prison officials allowed Caucasian inmates with African-

American inmates given that they had information on September 19, 2008, that Caucasian inmates

had orders to attack African-American inmates.  Doc. 51 at 74 (Pltf's Decl.).  Plaintiff also asserts

that it is a disputed issue of fact as to when Defendants knew that Caucasian inmates had orders to

attack African-American inmates on sight.  Doc. 51 at 79 (Pltf's Decl.).

Plaintiff also argues that Defendants were evasive during discovery and that:

> [t]here were several facts which Plaintiff plead in his complaint [and] motion to
> compel . . . Which the defendants have corroborated in their motion for summary
> judgment but have not been given . . . to Plaintiff . . . such as . . . that the causative
> factor of the July 25, 2008, [riot] was because of . . . a Caucasian Crip.

Doc. 51 at 78 (Pltf's Decl.).

21

**B.    Duration of Denial of Outdoor Exercise**

Plaintiff argues that the length of time Plaintiff was deprived of outdoor exercise in this case entails that a constitutional violation occurred.  Doc. 51 at 12.  Plaintiff argues that although in *Hayward v. Procurier*, no constitutional violation was found where exercise was restored after one month of lockdown resulting from the death of two inmates, in this case, the lockdown lasted months, implying that the duration alone should demonstrate a constitutional violation.  Doc. 51 at 12.

**C.    Subjective Prong**

Plaintiff argues that based upon *Richardson v. Runnels*, 594 F.3d 666, 672 (9th Cir. 2010), the issue of whether valid penological interests supports the exercise of discretion in implementing lockdowns is always an issue to be resolved for trial.  Doc. 51 at 13.  Plaintiff argues that when Defendants assert in the motion for summary judgment that violence between members of two different races often take racial overtones and lead to larger scale violence, that such assertion supports Plaintiff's argument that since Defendants knew ahead of time that Caucasian inmates were going to attack a Caucasian Crip, Defendants knew or should have known that it would result in a race riot.  Doc. 51 at 64.  In support of Plaintiff's argument that Defendants knew in advance that Caucasian inmates were planning an act of violence against a Caucasian Crip, Plaintiff cites to a declaration from inmate Jones who was a member of the Inmate Advisory Counsel who "spoke with Defendant Reynoso about the notes she had received stating that Caucasian inmates would aggress on Caucasian Crip Brandon Johnston . . .[this] conversation occurred previous to the July 25, 2008, melee."  Doc. 51 at 18; Doc. 51 at 53, 55, 58, 64; Doc. 51 at 70, 80 (Pltf's Decl.).  Plaintiff argues that the initial act of racial violence on July 25, 2008, could have been prevented if prison staff removed the Caucasian Crip.  Doc. 51 at 48.

Plaintiff argues that outdoor exercise should not have been denied to inmates who were not directly involved in the July 25, 2008, race riot.  Doc. 51 at 19.  As support, Plaintiff attaches a declaration from inmate Chappell stating that he has observed a pattern where Caucasian inmates routinely plan to attack other Caucasian inmates who associate with African-American Crip inmates and Plaintiff attaches a 2001 memorandum from California State Prison, Sacramento, directing that only Caucasian inmates and Crips be locked down since it was discovered that Caucasian inmates would attack a certain Crip on the basis of his race.  Doc. 51 at Pltf's Ex. S (2001 Memorandum & Chappell Decl.).

Plaintiff further argues that after he was searched and interviewed on August 8, 2011, he should have been allowed outdoor exercise in the mini concrete yards available to administrative segregation inmates.  Doc. 51 at 19, 55, 66; Doc. 51 at 68, 72-73 (Pltf's Decl)  Plaintiff asserts that CSATF's administrative segregation unit allows inmates ten hours of weekly outdoor exercise no matter what disciplinary violation they committed.  Doc. 51 at 75 (Pltf's Decl.).  Plaintiff states that while he was "housed at New Folsom State Prison level four maximum security prison, [he] participated in the mini concrete yard (SHU) program during lockdowns, with up to twenty other inmates, these are standard for all level four 180 design prisons, approximately nine throughout the state of California."  Doc. 51 at 69 (Pltf's Decl. citing to Pltf's Ex. A2; Pltf's Ex. B at Int. 3).

Plaintiff "disputes [Defendants' assertion] that the [gradual] release of inmates was based on the inmates most likely to program successfully" as, according to Plaintiff, "all African American inmates were released October 22, 2008, irrespective of disciplinary history."  Doc. 51 at 21.  Plaintiff argues that although Defendants assert that prison staff discovered weapons during the lockdowns, all such weapons were discovered on Caucasian inmates and it was not until January 13, 2009, that prison staff found any weapons on African-American inmates and this was only after

Caucasian inmates had already attacked African-American inmates three times.  Doc. 51 at 22, 62; Doc. 51 at 75-77 (Pltf's Decl.).  Plaintiff argues that given the frequent attacks by the Caucasian inmates against African-American inmates, "the defendants cannot show why African American inmates could not have been released to a normal program with Hispanic and ['Others'] after searches and interviews."  Doc. 52 at 23, 40-42, 44-45.  According to Plaintiff, the September 19, 2008, status report submitted by Defendants demonstrates that only the Caucasian inmates needed to have been on an investigation-based lockdown and at that time there was no reason for African-American inmates to remain on lockdown.  Doc. 51 at 27, 40-42.

Plaintiff argues that "race cannot be a determining factor as to whether one will participate in violence . . . ."  Doc. 51 at 59.  Further, Plaintiff states that since he has no known history of violence during his eighteen years of incarceration, an individualized finding should have occurred to allow him outdoor exercise on the yard or at least the mini concrete yard available to inmates in administrative segregation.  Doc. 51 at 23, 55, 66; Doc. 51 at 68, 74 (Pltf's Decl.).  Plaintiff asserts that he should have been allowed to program normally on August 21, 2008, after he was interviewed and searched since prison staff had no information that Plaintiff was a threat to the safety or security of the institution.  Doc. 51 at 35.  At the least, Plaintiff argues that he should have been placed in protective administrative segregation pursuant to Title 15 section 3335(a), where he could have had outdoor exercise.  Doc. 51 at 35, 66; Doc. 51 at 68 (Pltf's Decl.).

Plaintiff "disputes that inmates that are not affiliated with gangs are forced to hide weapons or assault people. Usually gang members do not operate outside their own gang."  Doc. 51 at 27, 59. As support, Plaintiff asserts that several African-American inmates submitted 602 grievances requesting to be released from lockdown and Plaintiff argues that since those inmates were interviewed, they would have informed prison staff if they were being pressured.  Doc. 51 at 27-28;

Doc. 51 at Pltf's Ex. H (Pltf's grievance); Doc. 51 at Pltf's Ex. L (Plntf's grievance); Doc. 51 at Pltf's Ex. T (complaint filed by another inmate).   Plaintiff adds that the defendants "don't specifically state that any African American inmates informed [prison staff]  that they [were] threatened."  Doc. 51 at 29.   Plaintiff also asserts that "officials know through protocol that Caucasian inmates, unlike African-American inmates, can be ordered to attack because there is so much rivalry in the African-American race such as Bloods vs. Crips, Crips vs. Black Guerilla Family and 415, non affiliates program without orders from any gang."  Doc. 51 at 34, 59; Doc. 51 at 71-72 (Pltf's Decl.).

Plaintiff further contends that African-American inmates could have been allowed segregated access to the yard like the Hispanics and "Others" since the violence was perpetrated by Caucasian inmates and not African-American inmates.  Doc. 51 at 24, 40-42, 44-47, 55, 66; Doc. 51 at 68 (Pltf's Decl.).  Plaintiff asserts that this is made even more evident by the fact that African-American inmates eventually did get out of lockdown before Caucasian inmates.  Doc. 51 at 37.   Further, Plaintiff argues that there is no evidence to suggest that African-American inmates could not safely program with Hispanic and "Other" inmates.  Doc. 51 at 25, 55.  Plaintiff also asserts that "[t]he defendants know through their experience that other uninvolved races will give false information to officials for the purpose of keeping exclusive races on lock-down, so that they can freely program."  Doc. 51 at 37; Doc. 51 at 74 (Pltf's Decl.).

Plaintiff argues that:

. . . although Defendants allege that Plaintiff could have been assaulted, coerced and forced to hide weapons, that theory is speculative . . . . [D]efendants present no evidence that any African American was assaulted, coerced or forced to hide weapons.  If [Defendants really believed that African Americans were at risk], then they were deliberately indifferent when they allowed [Inmate Advisory Counsel] members out of their cells on August 14, 2008, and again on September 3, 2008, [allowing] African American critical workers [to work].

Doc. 51 at 19-20, 29.  Although Defendants assert that lockdowns are more time consuming and undesirable, Plaintiff asserts that "the officials would rather [inmates] be placed on lock-down, so that the officials do not have to strip search every inmate to yard, as what occurs on normal program, or to school, or inmates who go to the medical facility or library."  Doc. 51 at 72 (Pltf's Decl.).

Plaintiff continues:

> [t]he officials would often place facility C on lock-down for reasons that they received an anonymous [note], then after a couple of weeks return to normal program without even interviewing or searching inmates.  They place facility C on lockdown also because a gate [is] broke[n] on . . . an entirely different facility.

Doc. 59 at 72 (Pltf's Decl.).

###    D.    Duty to find alternate means of providing exercise

Plaintiff quotes, "Even where security concerns might justify a limitation on permitting a prisoner 'to mingle with the general prison population' such concerns 'do not explain why other exercise arrangements [are] not made.'"  *Thomas v. Ponder*, 611 F.3d 1144, 1155 (9th Cir. 2010) (quoting *Spain v. Procunier*, 600 F.2d 189, 200 (9th Cir.1979)).  Plaintiff argues that Defendants could have allowed up to twenty inmates segregated by race in the small concrete yards as a viable alternative to complete suspension of outdoor exercise.  Doc. 51 at 24, 55, 66; Doc. 51 at 68 (Pltf's Decl.).  Plaintiff cites to his Exhibit A2 to demonstrate that other prisons allow use of mini concrete yards to allow exercise during lockdowns.  Doc. 51 at 24; Doc. 51 at Pltf's Ex. A2 (Memorandum from California State Prison - Sacramento).  Plaintiff also asserts that this solution is feasible since, according to Plaintiff, African-Americans make up less than half of the inmates in the general population of sixty-four cells and staff could have easily allowed thirty-two inmates to the mini concrete yards every other day.  Doc. 51 at 77 (Pltf.s Decl.).

###    E.    Causation

To refute Defendants' argument that Defendants Allison, Wan, and Reynoso did not "cause"

Plaintiff's alleged injury as required for § 1983 liability, because they did not control the duration or scope of the lockdowns, Plaintiff argues that Defendants fail to demonstrate that the Warden would not have followed the recommendations of his subordinate staff had they recommended ending the lockdowns sooner or recommended to allow inmates access to the mini concrete yard for outdoor exercise.  Doc. 51 at 20, 55, 63.

### F.    Evidentiary Strength

Plaintiff contends that, in making their security decisions, Defendants relied upon unreliable sources such as prison informants.  Doc. 51 at 17, 34-35.  Plaintiff states that "[i]t is a material fact[ual] dispute how the defendants are able to keep all African American inmates . . . on lock-down based on anonymous information."  Doc. 51 at 35, 43.  Plaintiff also critiques the vague reference that two African-Americans in his cell block were arousing racial tension.  Doc. 51 at 45.  In support of this argument, Plaintiff cites *Tousaint v. McCarthy*, 801 F.2d 1080, 1105 (9th Cir.1986), a case regarding the due process requirement that evidence must have some indicia of reliability.  Doc. 51 at 17, 34.  Plaintiff asserts that Defendants' purported evidence that implicates African-American inmates is "pretextual" and Defendants vague statements that there was "tension" with Caucasian inmates, a note from an unidentified African-American inmate that the inmates were heading for a "full blown war" and reports of African-Americans being "standoffish" is insufficient to demonstrate the necessity of keeping African-American inmates on lockdown.  Doc. 51 at 24; 62.  Plaintiff also argues that Defendants should be required to submit the confidential letters and sources for the Court to review to ensure that such sources are valid and should remain confidential.  Doc. 51 at 43.

### G.    Qualified Immunity

Plaintiff argues that since it is disputed whether Defendants "staged, provoked and instigated each racial altercation in order to deprive African American inmates outdoor exercise opportunities,"

Defendants should not be entitled to qualified immunity.  Doc. 51 at 49, 53; Doc. 51 at 22, 62; Doc. 51 at 75-77 (Pltf's Decl.).  Plaintiff also asserts that it is also disputed whether Defendants were deliberately indifferent towards the safety of African-American inmates by continuously allowing African-American and Caucasian inmates to program together.  Doc. 51 at 49, 56.  Plaintiff argues that because Defendants could have released small groups of African-Americans to the mini concrete yards after the searches and interviews were completed and there was no evidence of prior disciplinary history or violence, Defendants could have provided outdoor exercise to African-Americans on January 27, 2009, in a manner where they were safely segregated from the Caucasian inmate "aggressors."  Doc. 51 at 49, 55.

Plaintiff states that it is disputed as to what point in time Defendants should have released African-American inmates since "at no instance did [African American inmates] even agress upon Caucasian inmates" and Plaintiff asserts that African-American inmates could have safely programed with Hispanics and "Others" on September 19, 2008.  Doc. 51 at 49, 53.

Plaintiff counters that Defendants' reliance on *Norwood v. Vance*, 591 F3d 1062, and *Nobel v. Adams*, 636 F3d 525, is misplaced and argues that the cases do not support Defendants' qualified immunity argument because the underlying violence giving rise to the lockdowns was much more severe in *Vance* and *Nobel* and involved assaults on prison staff where in this case, the extended lockdowns did not involve assaults on prison staff.  Doc. 51 at 50-51.

V.    **Legal Standard and Analysis**

A.    **Summary Judgment Standard**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party:

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id*. Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

    If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable

jury could return a verdict for the nonmoving party, *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

"To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001). Rule 56(c) requires that affidavits submitted in support of a motion for summary judgment must: 1) be made on personal knowledge; 2) set out facts that would be admissible in evidence; and 3) show that the affiant or declarant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4); *Shakur v. Schriro*, 514 F.3d 878, 889-90 (9th Cir. 2008). In other words, "[t]he matters must be known to the declarant personally, as distinguished from matters of opinion or hearsay"; "[a] declarant's mere assertions that he or she possesses personal knowledge and competency to testify are not sufficient." *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1023 (N.D. Cal. 2006) (citing *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999 (9th Cir.1990)).

The parties bear the burden of supporting their motions and oppositions with the papers they wish the Court to consider and by specifically referencing any other portions of the record they wish the Court to consider. *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). The Court will not mine the record for triable issues of fact. *Id.*

### B.      42 U.S.C. § 1983-Causation

Section 1983 provides a cause of action against any person who, under color of state law, "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983; *Filarsky v. Delia*, 132 S. Ct. 1657, 1661 (2012); *Nelson v. Campbell*, 541 U.S. 637, 643 (2004); *Nurre v. Whitehead*, 580 F.3d 1087, 1092 (9th Cir. 2009). "A person 'subjects' another to the deprivation of a

constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978). "In a § 1983 action, the plaintiff must also demonstrate that the defendant's conduct was the actionable cause of the claimed injury. To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008) (internal citations omitted).  Proximate cause requires "'some direct relation between the injury asserted and the injurious conduct alleged.'" *Hemi Group, LLC v. City of New York*, 130 S.Ct. 983, 989, 991 (2010) (quoting *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258, 268 (1992)).

As employees of CDCR, Defendants acted under color of state law in executing the duties of their positions relating to the implementation and continuation of lockdowns at CSATF. Defendants argue that judgment should be in favor of Defendants Allison, Wan, and Reynoso because they did not "cause" Plaintiff's alleged injury as required for § 1983 liability, since they did not control the duration or scope of the lockdowns.  Doc. 45-1 at 8.  Defendants assert only Defendant Clark in his capacity as Warden, had the authority to modify or terminate the lockdowns. Doc. 46-1 (Clark Decl. ¶¶ 2-6); Doc. 46-2 (Allison Decl. ¶¶ 2-6).

Defendants Allison, Wan, and Reynoso "participate[d] in [Defendant Clark]'s affirmative acts," through giving advice, expertise and recommendations to enable Defendant Clark to approve of the scope and duration of the lockdowns. *See Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978). Defendant Clark stated in his declaration that: 1) he considered the programming recommendations and evidence provided by subordinate staff to assess the need for the lockdowns and to determine when the lockdowns could safely end; 2) he relied upon the investigations, analysis, and opinions

of his staff regarding the status of any ongoing investigations, the evidence collected, the effectiveness of the restrictions imposed as part of the modified program, the likelihood that violence would occur without the restrictions in place, the appropriateness of the scope of the restrictions, and the prospects and timetable for a phased unlock to return to normal programming.  Doc. 46-1 (Clark Decl. ¶¶ 2-6); Doc. 46-2 (Allison Decl. ¶¶ 2-6).  It is clear that Defendants Allison, Wan, and Reynoso were a part of Defendant Clark's decision making process to implement, continue and discontinue the lockdowns.  *See Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978); Doc. 46-1 (Clark Decl. ¶¶ 2-6); Doc. 46-2 (Allison Decl. ¶¶ 2-6).

The Court finds that the conduct of Defendants Allison, Wan, and Reynoso sufficiently satisfies the causation requirement for section 1983.  *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008); *cf. Hayes v. Dovey*, No. 09-cv-1016, 2011 WL 1157532 at *5 (S.D. Cal. 2011).

**C.**      **Deprivation of Outdoor Exercise in Violation of the Eighth Amendment**

      **1.**      **Deliberate Indifference**

"The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement."  *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006).  Where a prisoner alleges an Eighth Amendment violation stemming from inhumane conditions of confinement, prison officials may be held liable only if they acted with "deliberate indifference to a substantial risk of serious harm."  *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998).  The deliberate indifference standard involves an objective and a subjective requirement.  First, the alleged deprivation must be, in objective terms, "sufficiently serious."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citing

*Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  Second, for the subjective requirement, the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety . . . ."  *Farmer*, 511 U.S. at 837.

For the objective requirement, "[w]hat is necessary to show sufficient harm for purposes of the Cruel and Unusual Punishment Clause depends upon the claim at issue . . . ."  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).  "[E]xtreme deprivations are required to make out a[n] [Eighth Amendment] conditions-of-confinement claim."  *Id.* at 9 (citation omitted).  In determining whether a deprivation of a basic necessity is sufficiently serious to satisfy the objective component of an Eighth Amendment claim, a court must consider the circumstances, nature, and duration of the deprivation.  The more basic the need, the shorter the time it can be withheld.  *See Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).  "Like food, [exercise] is 'a basic human need protected by the Eighth Amendment.'"  *Thomas v. Ponder*, 611 F.3d 1144, 1152 (9th Cir. 2010); *accord Hearns v. Terhune*, 413 F.3d 1036, 1042 (9th Cir. 2005).  Inmates have a constitutional right to exercise and the denial of outdoor exercise for an extended period of time is sufficiently serious to state a claim under the Eighth Amendment.  *Thomas v. Ponder*, 611 F.3d 1144, 1151-52 (9th Cir. 2010).

## 2.     Competing Constitutional Duties and the Subjective Standard

Neither party addresses the following apparent issue: whether, absent exigent circumstances, when prison officials choose to fulfil their constitutional duty to protect inmates in a matter which compromises their constitutional duty to ensure adequate exercise, have prison officials violated the inmates' Eighth Amendment right to exercise.  *See Johnson v. Lewis*, 217 F.3d 726, 733-734 (recognizing a higher culpable standard to find a constitutional violation when exigent circumstances necessitate "split-second, life-and-death decisions").  Due to prison overcrowding, frequent and severe prison violence has become more common than extraordinary, and the use of lockdowns to

33

restore order has become repeated and foreseeable. *See supra* at section II A. These Californian prison lockdown cases often involve several competing constitutional duties that arise under the Eighth Amendment duty to protect inmates from injury, the Eighth Amendment duty to ensure inmates do not suffer prolonged denials of outdoor exercise, and the duty to implement lockdowns in a manner that does not violate the Equal Protection clause. *See e.g., Noble v. Adams*, 646 F.3d 1138 (9th Cir. 2011); *Norwood v. Vance*, 591 F.3d 1062 (9th Cir. 2010); *Richardson v. Runnels*, 594 F.3d 666 (9th Cir. 2010); *Thomas v. Ponder*, 611 F.3d 1144 (9th Cir. 2010); *Johnson v. Lewis*,  217 F.3d 726 (9th 2000); *Walker v. Gomez*, 370 F.3d 969 (9th Cir. 2004); *Hayward v. Procunier*, 629 F.2d 599 (9th Cir. 1980); *Rideau v. Woodford*, 399 Fed.Appx. 258, 2010 WL 3988930 (9th Cir. 2010) (unpublished); *Jones v. Garcia*, 430 F.Supp.2d 1095, 1102-03 (S.D. Cal. 2006); *Hayes v. Garcia*, 461 F.Supp.2d 1198, 1201, 1207-08 (S.D. Cal. 2006); *Hurd v. Garcia*, 454 F.Supp.2d 1032, 1042-45 (S.D. Cal. 2006).

Although courts are to give due regard for prison officials' "unenviable task of keeping dangerous men in safe custody under humane conditions," *Farmer v. Brennan*, 511 U.S. 825, 845 (1994) (quoting *Spain v. Procunier*, 600 F.2d 189, 193 (9th Cir. 1979)), the deference has limits. *See Brown v. Plata*, 131 S. Ct. 1910, 1928-29 (2011); *Johnson v. Lewis*, 217 F.3d 726, 736 (9th Cir. 2000) (Sneed, J., dissenting) ("Our deference of course has limits. A line must be drawn somewhere. For example, bad faith might be presumed in the absence of extraordinary circumstances if prison officials asserted that inmates needed to be maintained in this position for months."). "Courts nevertheless must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners. Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown v. Plata*, 131 S. Ct. 1910, 1928-29 (2011). Such a limit is delineated in *Johnson v. Lewis*, where greater deference is only

applied to "exigent circumstances" requiring "split-second, life-and-death decisions." *See Johnson v. Lewis*, 217 F.3d 726, 733-734.

Absent exigent circumstances, courts should not defer to prison officials to the extent that such decisions protect one constitutional right at the expense of another. *See Hebbe v. Pliler*, 627 F.3d 338, 343 (9th Cir. 2010); *Johnson v. Lewis*, 217 F.3d 726, 733-734. In instances where prison officials forced prisoners to chose between going to court and outdoor exercise, the Ninth Circuit has held that: "an inmate cannot be forced to sacrifice one constitutionally protected right solely because another is respected." *Hebbe v. Pliler*, 627 F.3d 338, 343 (9th Cir. 2010) (*quoting Allen v. City and County of Honolulu*, 39 F.3d 936, 940 (9th Cir.1994)). Unlike in *Hebbe v. Pliler*, Defendants are not forcing Plaintiff to make the choice. *See Hebbe v. Pliler*, 627 F.3d 338, 343 (9th Cir. 2010). Rather, Defendants chose for Plaintiff one Constitutional right at the expense of another: Defendants repeatedly chose to deny outdoor exercise to Plaintiff for extended periods of time in order to fulfil their Eighth Amendment duty to protect Plaintiff and other inmates from harm. The Court finds that under *Hebbe v. Pliler,* Defendants can violate Plaintiff's right to outdoor exercise in their choice of repeated lockdowns which deprive outdoor exercise for extended periods of time, even if said lockdowns are implemented for the purpose of fulfilling their duty to protect prisoners and staff. *See Hebbe v. Pliler*, 627 F.3d 338, 343 (9th Cir. 2010); *Johnson v. Lewis*, 217 F.3d 726, 733-734.

There appears to be contradictions in the precedent articulating the subjective requirement for deliberate indifference, and recent cases appear to conflate the subjective requirement of knowledge with a higher standard of motive although exigent circumstances, as described in *Johnson v. Lewis*, are absent. *Compare  Johnson v. Lewis*, 217 F.3d 726, 733-734 (9th Cir. 2000) *and Farmer v. Brennan*, 511 U.S. 825, 835 (1970) *with Thomas v. Ponder*, 611 F.3d 1144, 1150-51 (9th Cir. 2010) *and Noble v. Adams*, 646 F.3d 1138, 1143 (9th Cir. 2011) (citing *Norwood v. Vance*, 591 F.3d 1062,

1070).[9]

In *Thomas v. Ponder*, the Ninth Circuit states that to satisfy the subjective prong, "the inmate must show that the prison officials had no 'reasonable' justification for the deprivation, in spite of that risk." *Thomas v. Ponder*, 611 F.3d 1144, 1151.  As support, the court in *Ponder* quotes *Farmer v. Brennan*, 511 U.S. 825, 844: "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably." *Thomas v. Ponder*, 611 F.3d 1144, 1151.  The Court finds that the language quoted in *Farmer* looks to whether the defendants directly responded to address the specific risk at issue and whether their calculated response was reasonable.  *See  Farmer v. Brennan*, 511 U.S. 825, 844; *Johnson v. Lewis*, 217 F.3d 726, 733-734 (9th Cir. 2000).   The Court finds that such a reading is more consistent with the deliberate indifference standard articulated by the Supreme Court in *Farmer* and by the Ninth in *Johnson v. Lewis*, 217 F.3d 726, 733-734 (9th Cir. 2000); *cf. Wilhelm v. Rotman*, 680 F.3d 1113, 1122-23 (9th Cir. 2012) (finding that deliberate indifference may be found where prison officials failed to address a prisoner's serious need although the inaction was due to administrative concerns).

Whether there exist valid penological interests and safety concerns to deprive one constitutional right in order to protect another should only be a factor in determining whether the subjective requirement was met during exigent circumstances where officials have to make "split-second, life-and-death decisions" such as decisions made during a riot.  *See Hebbe v. Pliler*, 627 F.3d 338, 343 (9th Cir. 2010); *Johnson v. Lewis*, 217 F.3d 726, 733-734 (9th Cir. 2000); *see also*

---

[9] *Noble v. Adams* conflates the underlying constitutional violation with qualified immunity, stating "we defer to prison officials' judgment so long as that judgment does not manifest either deliberate indifference or an intent to inflict harm." *Noble v. Adams*, 646 F.3d 1138, 1143 (9th Cir. 2011) (citing *Norwood v. Vance*, 591 F.3d 1062, 1070).  Reading *Noble* and *Ponder* together provides no guidance for the Court: the Court should defer to prison officials' judgment if they were reasonable in their choice to be deliberately indifferent and thus they did not violate the Eighth Amendment and, in case officials did violate the Eighth Amendment, the officials are entitled to qualified immunity unless they were deliberately indifferent.

*Jordan v. Gardner*, 986 F.2d 1521, 1528 (9th Cir.1993) (en banc); *Farmer v. Brennan*, 511 U.S. 825, 835 (1970) (describing a higher standard applied in situations where "the decisions of prison officials are typically made 'in haste, under pressure, and frequently without the luxury of a second chance'").[10]   In *Richardson v. Runnels*, the court explicitly limited the higher state-of-mind requirement articulated in *Norwood v. Vance*, 591 F.3d 1062 to apply to the "defendant-friendly rules of qualified immunity" rather than apply in determining whether there exists a constitutional violation. *See Richardson v. Runnels*, 594 F.3d 666, 672 (9th Cir. 2010).  However, once inmates are secured, "the state-of-mind requirement . . . [is] deliberate indifference." *Johnson v. Lewis*, 217 F.3d 726, 734 (9th Cir. 2000).

"In these cases, the plaintiffs must show that the defendant officials had actual knowledge of the plaintiffs' basic human needs and deliberately refused to meet those needs. Whether an official possessed such knowledge 'is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . .'" *Johnson v. Lewis*, 217 F.3d 726, 734 (9th Cir. 2000) (*quoting Farmer v. Brennan*, 511 U.S. 825, 842 (1970).  When evaluating whether "officials had actual knowledge of the plaintiffs' basic human needs and deliberately refused to meet those needs," Defendants' purpose or the reasonableness for acting deliberately indifferent is not a factor to determine whether a constitutional violation occurred: the inquiry for deliberate indifference neither looks to the heightened culpable  state of mind of "maliciously and sadistically for the very purpose of causing harm" *Farmer v. Brennan*, 511 U.S. 825, 835-36 (1994), nor does it lend to the higher deference of valid penological purposes of prison officials absent exigent circumstances. *See Johnson*

---

[10] The higher standard for exigent circumstances also tracks with Ninth Circuit precedent limiting the duty to provide *regular* outdoor exercise where conditions make carrying out such duty temporarily impracticable or impossible. *See Allen v. Sakai*, 40 F.3d 1001, 1004 (1994) (stating that prison officials were required to "provide regular outdoor exercise to [the plaintiff] unless 'inclement weather, unusual circumstances, or disciplinary needs made that impossible'") (quoting *Spain v. Procunier*, 600 F.2d 189, 199 (1979) (Kennedy, J.)).

1

2   *v. Lewis*, 217 F.3d 726, 734 (9th Cir. 2000); *see Richardson v. Runnels*, 594 F.3d 666, 672.

3           **3.      Application-Objective Requirement**

4

5           The objective component has been satisfied at the summary judgment stage in this case.  The

6   complete denial of outdoor exercise for ninety-two days, then after a three week period, a subsequent

7   denial of outdoor exercise for seventy-two days satisfies the objective prong of the *Farmer* test.  *See*

8   *e.g.*, *Lopez v. Smith*, 203 F.3d 1122, 1333 & n5 (9th Cir. 2000) (en banc) (six-and-one-half weeks

9   deprivation of "all access to outdoor exercise" sufficient to satisfy Eighth Amendment's objective

10  requirements); *Allen v. Sakai*, 48 F.3d 1082, 1086 (9th Cir.1994); *LeMaire v. Maass*, 12 F.3d 1444,

11

12  1457 (9th Cir. 1993) ("[O]rdinarily the lack of outside exercise for extended periods is a sufficiently

13  serious deprivation and thus meets the requisite harm necessary to satisfy *Wilson*'s objective test.").

14  Defendants do not dispute that Plaintiff did not have outdoor exercise while he was on lockdown for

15  ninety-two days, then after a three week period, Plaintiff again did not have outdoor exercise during

16
    the subsequent lockdown period of seventy-two days.  Moreover, Plaintiff submits evidence that the
17
18  denial of outdoor exercise had adverse effects on him physically and psychologically.  Doc. 51 at 71

19  (Pltf's Decl.); Doc. 51-1 (Exhibit F).

20          **4.      Application-Subjective Requirement**

21

22          Defendants do not dispute that they knew the duration of Plaintiff's confinement without

23  outdoor exercise.  The attached declarations and exhibits demonstrate that Defendants participated

24  in the decision making to implement and continue the lockdowns which denied outdoor exercise.

25  Doc. 46-1 (Clark Decl.); Doc. 46-2 & Doc. 46-3 (Allison Decl. & attached exhibits including

26  "program status reports"); Doc. 46-4 (Wan Decl.); Doc. 46-5 (Reynoso Decl. ¶ 9).  Additionally,

27
    Plaintiff and other inmates submitted repeated complaints to prison officials regarding the duration
28

of the lockdowns and deprivation of out-of-cell exercise.  Plaintiff and several other African-American inmates submitted 602 grievances requesting to be released from the lockdown.  Doc. 51 at 27-28; Doc. 51 at Pltf's Ex. H (Pltf's grievance); Doc. 51 at Pltf's Ex. L (Plntf's grievance); Doc. 51 at Pltf's Ex. T (complaint filed by another inmate).

The Ninth Circuit observed in *Ponder:*

> [f]or over thirty years, we have emphasized that "some form of regular outdoor exercise is extremely important to the psychological and physical well-being of the inmates." California strictly regulates this "regular outdoor exercise," ordinarily requiring prisons to provide inmates held in the general population with at least three hours of exercise per week and inmates held in segregation with at least one hour of exercise per day. . . .
>       In light of the above, we conclude that the prison officials were aware as a matter of law of the potential consequences of depriving an inmate of out-of-cell exercise for an extended period of time.

*Thomas v. Ponder*, 611 F.3d 1144, 1152 (internal citations omitted).  The Court finds that, Plaintiff's approximate five-month deprivation of outdoor exercise is grossly divergent from the California regulation requiring at least three hours of outdoor exercise per week and that Defendants knew that such deprivation posed a "substantial risk of serious harm" to Plaintiff's mental and physical health.  *See Thomas v. Ponder*, 611 F.3d 1144, 1152; *see also Richardson v. Runnels*, 594 F.3d 666, 672 (9th Cir. 2010) ("If the prison allots a standard number of hours per week for exercise, the prison officials are aware that denial of this exercise for a substantial period creates an excessive risk to a prisoner's health.").

Defendants argue that "[b]ecause the Defendants' obligation to maintain order and protect inmates and staff from assaults takes precedence over the prison's outdoor exercise programs, and the reasonable measures they took through the [lockdowns] fulfilled that obligation, [Plaintiff]'s rights under the Eighth Amendment were not violated . . . ."  Doc. 45-1 at 29.  Defendants describe a series of investigations, calculated increases of inmate privileges and review procedures for the

lockdowns.  Doc. 46-1 (Clark Decl.); Doc. 46-2 & Doc. 46-3 (Allison Decl. & attached exhibits including "program status reports"); Doc. 46-4 (Wan Decl.); Doc. 46-5 (Reynoso Decl. ¶ 9).  The purpose of the lockdown meetings, cell searches, investigations from informants and interviews was, in part, to "assess the cause of the violence and locate any additional weapons, weapons stock, or other contraband."  *See e.g.*, Doc. 46-1 (Clark Decl. ¶ 37b); Doc. 46-2 (Allison Decl. ¶ 37b, Ex. A p. 2).

Central to Defendants' argument is how to apply the language from *Farmer* that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably."  *See Farmer v. Brennan*, 511 U.S. 825, 844.  The Court finds that the above language from *Farmer* looks to whether the defendants directly responded to address the specific risk at issue and whether their calculated response was reasonable.  *See Farmer v. Brennan*, 511 U.S. 825, 844; *Johnson v. Lewis*, 217 F.3d 726, 733-734 (not extending higher standard of deference once prisoners have been secured after riot).

While Defendants' actions were reasonable to address the primary goal of restoring order and preventing harm, Defendants do not show any act aimed to provide inmates out-of-cell exercise during these lengthy repeated lockdowns.[11]  Although Defendants' actions to prevent further violence, secondarily, will result in the end of the lockdown and restoration of outdoor exercise, Defendants did not take any direct action to address Plaintiff's need for outdoor exercise.  Defendants have not provided any evidence to demonstrate that they took measures to address the repeated extended denial of outdoor exercise once exigent circumstances subsided and prisoners were secured for months at a time.  Given that Defendants did not respond at all to address the repeated prolonged denial of outdoor exercise, the Court cannot find that Defendants responded reasonably to the substantial risk

---

[11] Plaintiff describes at length alternate measures that prison officials could take to provide out-of-cell exercise.  Doc. 51 at 1-2, 55, 58; Doc. 51 at 75-77 (Pltf's Decl.).  However, the Court need not speculate on what actions prison officials could have taken.

to Plaintiff's health. *See Farmer v. Brennan*, 511 U.S. 825, 844. *Thomas v. Ponder*, 611 F.3d 1144, 1152.

Based on the forgoing, the Court finds that Defendants violated Plaintiff's Eighth Amendment right to outdoor exercise.

## C.    Qualified Immunity

Defendants argue that all defendants are entitled to qualified immunity from damages because there was no clearly established right which a reasonable correctional official would have known they were violating. Doc. 45-1 at 8, 28-32.

### 1.    Clearly Established Law

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). To be clearly established, a right must be sufficiently clear "that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2078 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083. Absent controlling authority, there need to exist a robust 'consensus of cases of persuasive authority.' *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Where there exist substantial difference in opinion regarding the application of precedent, qualified immunity should be granted. *See Safford Unified School Dist. No. 1 v. Redding*, 129 S.Ct.

41

2633, 2644  (2009).  Although the law appeared clearly established in 2000 with *Johnson v. Lewis*, 217 F.3d 726, several district court cases in 2006 placed the law in question.  *Compare Johnson v. Lewis*, 217 F.3d 726 *with Jones v. Garcia*, 430 F.Supp.2d 1095, 1102-03 (S.D. Cal. 2006) (finding no Eighth Amendment violation where prisoner was denied outdoor exercise for ten months due to ongoing threats and violence) *and Hayes v. Garcia*, 461 F.Supp.2d 1198, 1201, 1207-08 (S.D. Cal. 2006) (same for nine-month denial of outdoor exercise) *and Hurd v. Garcia*, 454 F.Supp.2d 1032, 1042-45 (S.D. Cal. 2006) (same for five-month denial); *see also Norwood v. Vance*, 591 F.3d 1062, 1070-78) (Thomas, J., dissenting).  These 2006 cases were cited with approval in *Norwood v. Vance*, 591 F3d 1062, 1070.

Precedent existing at the time of the lockdowns during the end of 2008 and beginning of 2009 could not have "placed the . . . constitutional question beyond debate" that Defendants violated the Eighth Amendment by implementing and continuing the lockdowns to ensure the safety of its staff and inmates at the expense of the inmates' right to outdoor exercise.  *See Noble v. Adams*, 646 F.3d 1138, 1142-43; *Norwood v. Vance*, 591 F3d 1062; *Jones v. Garcia*, 430 F.Supp.2d 1095, 1102-03 (S.D. Cal. 2006) (finding no Eighth Amendment violation where prisoner was denied outdoor exercise for ten months due to ongoing threats and violence); *Hayes v. Garcia*, 461 F.Supp.2d 1198, 1201, 1207-08 (S.D.Cal.2006) (same for nine-month denial of outdoor exercise); *Hurd v. Garcia*, 454 F.Supp.2d 1032, 1042-45 (S.D.Cal.2006) (same for five-month denial).  As such, the law was not clearly established at the time of the lockdowns to place Defendants on notice that their conduct violated Plaintiff's Eighth Amendment right to outdoor exercise.

### 2.    Bad Faith

Plaintiff argues at length that Defendants acted in bad faith because they knew that a Caucasian inmate named Brandon Johnston was a member of a predominately African-American gang and knew that other Caucasian inmates were threatening injury to this inmate.  Doc. 51 at 1-3,

55, 58, 64; Doc. 51 at 75-77.  Plaintiff argues that when Defendants assert in the motion for summary judgment that violence between members of two different races often take racial overtones and lead to larger scale violence, that such assertion supports Plaintiff's argument that since Defendants knew ahead of time that Caucasian inmates were going to attack a Caucasian Crip, Defendants knew or should have known that it would result in a race riot.  Doc. 51 at 64.  Plaintiff concludes that because of Defendants' institutional knowledge of Caucasian inmates propensity to attack other Caucasians who associate with African-American inmates, Defendants knew that allowing inmate Johnston out in the yard would result in a race riot which would necessitate a lockdown.  Doc. 51 at 1-3, 55, 58, 64; Doc. 51 at 75-77.  Indeed, Defends acknowledge that the riot stemmed from an unidentified group of Caucasian inmates not wanting a new Caucasian inmate to associate with African-American gang members.  Doc. 46-1 (Clark Decl. ¶ 37d); Doc. 46-2 (Allison Decl. ¶ 37d).

Plaintiff further argues that after the initial lockdown, Defendants acted in bad faith by repeatedly allowing Caucasian and African-American inmates to interact although Defendants knew that Caucasian inmates would attack African-American inmates.  Doc. 51 at 1-5, 55-58, 64; Doc. 51 at 73-74.  Defendants acknowledge that Caucasian inmates had attacked African-American inmates three times after the initial riot.  Doc. 46-1 (Clark Decl. ¶ 37n) (November 18th attack); Doc. 46-2 (Allison Decl. ¶ 37n, Ex. A p. 36) (November 18th attack);  Doc. 46-3 (Allison Decl. at Ex. A, pp. 47-50) (December 24th attack); Doc. 46-3 (Allison Decl. at Ex. A, p. 54) (January 21st attack).

Even if Plaintiff proved that, prior to the race riot, Defendants knew that Caucasian inmates were threatening to harm another Caucasian inmate who regularly associated with African-American inmates, the chain of inferences to demonstrate bad faith is too attenuated.  Essentially, Plaintiff argues that Defendants knew that when a Caucasian inmate attacked another Caucasian inmate who was a part of a predominately African-American gang, that the African-American gang members would come to the aid, then inmates witnessing the two races fighting would join to create a race riot

and necessitate a lockdown. A particularized threat of Caucasians attacking a Caucasian who affiliated with African-Americans, is not a particularized showing that such an attack would develop into a race riot. Nor does it follow that an investigation after the riot was unnecessary, since the scale of the violence was not foreseeable and the need to investigate the origin of the weapon used in the initial riot was apparent. *See* Doc. 46-1 (Clark Decl. ¶ 37b); Doc. 46-2 (Allison Decl. ¶ 37b, Ex. A p. 2).

In regards to Plaintiff's second argument that Defendants acted in bad faith by allowing Caucasian and African-American inmates to interact when it was obvious that the Caucasian inmates were repeatedly the aggressors, the Court finds that Defendants did not act in bad faith. The Equal Protection Clause prohibits segregation of inmates by race merely because of a generalized expectation of racial violence. *See Johnson v. California*, 543 U.S. 499, 507-08 (2005). The record demonstrates that Defendants sought to restore the prison to normal programing through incrementally increasing privileges which meant allowing smaller groups of inmates from both races to use more facilities and which created greater opportunity for both groups to interact. Doc. 46-1 (Clark Decl. ¶ 17, ¶ 37i, ¶ 37j); Doc. 46-2 (Allison Decl. ¶ 17, ¶ 37i, ¶ 37j & at Ex. A p. 11, 14); Doc. 46-4 (Wan Decl. ¶ 17); Doc. 46-5 (Reynoso Decl. ¶ 17). Although Caucasian inmates had attacked African-American inmates, the November 18th attack happened after an extended lockdown where Defendants believed tensions had subsided. With the December 24th attack, Defendants had information that the December 24th attack was an isolated incident and not a part of a larger campaign of organized violence. Doc. 46-1 (Clark Decl. ¶ 37r). The attack on January 21, 2009, was unprovoked and between IAC members, and allowing IAC members to communicate was an intermediate step to de-escalating the lockdown and restoring normal programing. *See* Doc. 46-3 (Allison Decl. at Ex. A, p. 54).

Based on the above, the Court finds that Plaintiff fails to demonstrate that Defendants acted

44

in bad faith when implementing the initial lockdown in response to the riot and continuing the subsequent lockdowns in response to the continued violence and threats of violence between Caucasian and African-American inmates.  As such, Defendants are entitled to qualified immunity.

### D.      Injunctive Relief Moot[12]

Under Article III of the Constitution , the jurisdiction of federal courts is limited to justiciable cases or controversies, and for a plaintiff's claim to be justiciable, the plaintiff must have standing and the claim must not be moot.  *Jacobs v. Clark County School District*, 526 F.3d 419, 425 (9th 2008) (quotation marks and citations omitted); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 129 S.Ct. 1142, 1149 (2009); *Davis v. Fed. Election Com'n*, 554 U.S. 724, 733-34, 128 S.Ct. 2759, 2768-69 (2008); *Oregon Advocacy Ctr.*, 322 F.3d 1101, 1108 (9th Cir. 2003); *Bernhardt v. County of Los Angeles*, 279 F.3d 862, 868-69 (9th Cir. 2002).  Constitutional standing requires, as an irreducible minimum, that there be (1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision.  *Oregon Advocacy Ctr.*, 322 F.3d at 1108 (quotation marks and citations omitted); *see also Summers*, 555 U.S. at 493; *Davis*, 554 U.S. at 733; *Jacobs*, 526 F.3d at 425; *Bernhardt*, 279 F.3d at 868-69.  While standing is determined based on the facts as they existed at the time the complaint was filed, an actual controversy must exist at all stages of review, and a claim becomes moot and non-justiciable if the requisite personal interest captured by the standing doctrine ceases to exist at any point during the litigation.  *Jacobs*, 526 F.3d at 425 (quotation marks and citations omitted); *Oregon Advocacy Ctr.*, 322 F.3d at 1116 (quotation marks and citations omitted); *see also Alvarez v. Smith*,130 S. Ct. 576, 580 (2009); *Bernhardt*, 279 F.3d at 872.

### 1.      Capable-of-Repetition-Yet-Evading Review Exception

---

[12] Granting qualified immunity does not preclude injunctive relief.  *Walker v. Gomez*, 370 F.3d 969, 978 (9th Cir. 2004).

A prisoner's transfer away from the institution at which the challenged conduct is occurring will generally moot any claims for injunctive relief relating to the prison's policies, unless the suit is certified as a class action. *Dilley v. Gunn*, 64 F.3d 1365, 1368 (9th Cir. 1995) (quotation marks omitted); *see also Nelson v. Heiss*, 271 F.3d 891, 897 (9th Cir. 2001); *Johnson v. Moore*, 948 F.2d 517, 519 (9th Cir. 1991). The claim is not moot, however, if there is a likelihood of recurrence. *Demery v. Arpaio*, 378 F.3d 1020, 1026 (9th Cir. 2004) (quotation marks omitted). The capable-of-repetition-yet-evading-review exception to the mootness doctrine applies when: 1) the duration of the challenged action is too short to be litigated prior to cessation; and 2) there is a reasonable expectation that the same party will be subjected to the same offending conduct. *Demery*, 378 F.3d at 1026 (quotation marks and citations omitted); *see also Turner v. Rogers*, 131 S.Ct. 2507, 2514-15 (2011); *Alvarez*, 130 S.Ct. at 581.

Here, the violation at issue are prolonged lockdowns at CSATF which deny Plaintiff outdoor exercise. Since the filing of this complaint, Plaintiff has since been transferred to Calipatria State Prison.

### a.    Duration of Challenged Action

Given that lockdowns such as the ones complained of by Plaintiff are generally too brief for the litigation process to redress and are capable of being repeated, the Court finds, that the first prong is satisfied. *See Turner*, 131 S.Ct. at 2515 (imprisonment of up to 12 months too short to be fully litigated); *Demery*, 378 F.3d at 1027 (pretrial detention temporary by nature).

### b.    Reasonable Expectation of Transfer Back to CSATF

Next, there must be a demonstrated probability or a reasonable expectation that Plaintiff will be transferred back to SATF. *Demery*, 378 F.3d at 1027. There is no information in the record concerning why Plaintiff was initially transferred to SATF in 2007 or why he was transferred to Calipatria in 2010. Plaintiff fails to establish that there is a reasonable expectation to be transferred

46

back to CSATF.[13]  *Dilley*, 64 F.3d at 1369; *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (finding that a the threat of reoccurrence is a real, rather than speculative).

 'A federal court may issue an injunction if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim; it may not attempt to determine the rights of persons not before the court.' *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (quoting *Zepeda v. U.S. INS*, 753 F.2d 719, 727 (9th Cir. 1985).  As the claims in this action arise from CSATF and Plaintiff has since been transferred to Calipatria State Prison, the court does not have jurisdiction in this action over prison officials at Calipatria State Prison and Defendants do now have authority or control over Plaintiff and his conditions of confinement at Calipatria State Prison.  Plaintiff's request for injunctive relief is moot and thus, the court cannot issue an injunctive remedy against Defendants in this action. *Dilley*, 64 F.3d at 1369; *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004).

**VI.     Conclusion and Recommendation**

 Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The Court finds that Defendants violated Plaintiff's Eighth Amendment right to outdoor exercise;

2. Defendants are entitled to qualified immunity and their motion for summary judgment, filed June 21, 2011, be GRANTED;

3. Plaintiff's request for injunctive relief be denied as moot; and

4. Judgment be entered on behalf of Defendants and against Plaintiff.

///

///

---

[13] Given that CDCR is not a party, the remedy must be tailored to the defendants and prison in question. *See e.g.*, *Nelson v. Heiss*, 271 F.3d 891, 897 (9th Cir. 2001); *Randolph v. Rodgers*, 170 F.3d 850, 856-57 (8th Cir.1999).

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these findings and recommendations, Plaintiff may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Plaintiff is advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:     July 31, 2012

_____
UNITED STATES MAGISTRATE JUDGE