1
2
3
4
5
6                    **UNITED STATES DISTRICT COURT**
7                     EASTERN DISTRICT OF CALIFORNIA
8
9   GREGORY LYNN NORWOOD,              CASE NO. 1:09-cv-00330-AWI-SAB (PC)

10                  Plaintiff,          FINDINGS AND RECOMMENDATIONS
                                        RECOMMENDING DEFENDANTS' MOTION
            v.                          FOR SUMMARY JUDGMENT BE GRANTED
11
    MATTHEW L. CATE, et al.,            (ECF No. 45)
12
                    Defendants.         THIRTY-DAY OBJECTION DEADLINE
13
    _____/
14

15                                     **I.**

16                          **PROCEDURAL HISTORY**

17          Plaintiff Gregory Lynn Norwood ("Plaintiff"), a state prisoner proceeding pro se and in forma

18   pauperis, filed this civil rights action pursuant to 42 U.S.C. § 1983 on February 24, 2009.  This

19   action is proceeding against Defendants Kenneth Clark, K. Allison, T.P. Wan, J. Reynoso, and W.J.

20   Sullivan for subjecting Plaintiff to unconstitutional conditions of confinement in violation of the

21   Eighth Amendment.  Plaintiff's claim arises out of Defendants allegedly setting up conditions that

22   led to the deprivation of outdoor exercise during the lockdown periods of July 25, 2008 to October

23   22, 2008 and November 18, 2008 to January 29, 2009.[1]

24          On June 21, 2011, Defendants filed a motion for summary judgment.[2]  (ECF No. 45.)  On

25   _____

26      [1] Plaintiff's amended complaint indicated that the first lockdown lasted until November 17, 2008. (ECF No.
    10.)  However, Plaintiff later amended this date to October 22, 2008 in his motion for clarification. (ECF No. 18.)

27      [2] Defendants filed a motion for summary judgment in regards to the Eighth Amendment claim for the denial
    of outdoor exercise.  Defendants incorrectly state that "Norwood's amended complaint states only a claim under the
28   Eighth Amendment regarding the denial of exercise."  Def's Mem. of P.&A. in Supp. of Defs' Mot. Summ. J. at 1.,

                                             1

July 25, 2011, Plaintiff filed an opposition. (ECF No. 51.)  On August 1, 2012, the Court issued a findings and recommendations recommending to grant Defendants' motion for summary judgment. (ECF No. 70.)  On October 19, 2012, the Court issued an order permitting Plaintiff opportunity to withdraw his opposition and file an amended opposition in light of <u>Woods v. Carey</u>, 684 F.3d 934 (9th Cir. 2012).  (ECF No. 75.)

On November 13, 2012, Plaintiff filed an amended opposition to the motion for summary judgment. (ECF No. 76.)  On November 19, 2012, Defendants filed objections to Plaintiff's amended opposition, which the Court construed as Defendants' reply.  (ECF No. 77.)  On February 11, 2013, the Court vacated its findings and recommendations in light of Plaintiff's amended opposition and Defendants' construed reply.  (ECF No. 83.)  Defendants' motion for summary judgment has been submitted upon the record, and these findings and recommendations now issue.  Local Rule 230(*l*).

## II.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); <u>Wash. Mut. Inc. v. United States.</u>, 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, although it is not required to do so.  Fed.

ECF No. 45-1.)  Defendants do not address the issue of whether Defendants "failed to handle the situation in a way that would have minimized both the security risks that led to the lock-downs and the length of the lock-downs." (F.&R. at 2, ECF No. 11.) The Court will only address the arguments raised in Defendants' motion for summary judgment, and thus, the issue of whether Defendants set up conditions that led to rioting and lockdowns will proceed to trial.

1   R. Civ. P. 56(c)(3); Carmen v. S.F. Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).

2       Defendants do not bear the burden of proof at trial and in moving for summary judgment,

3   they need only prove an absence of evidence to support Plaintiff's case.   In re Oracle Corp. Sec.

4   Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106

5   S.Ct. 2548 (1986)).   If Defendants meet their initial burden, the burden then shifts to Plaintiff "to

6   designate specific facts demonstrating the existence of genuine issues for trial."   In re Oracle

7   Corp., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 323).   This requires Plaintiff to "show

8   more than the mere existence of a scintilla of evidence."   Id. (citing Anderson v. Liberty Lobby,

9   Inc., 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

10      However, in judging the evidence at the summary judgment stage, the Court may not

11  make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless,

12  Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw

13  all inferences in the light most favorable to the nonmoving party and determine whether a

14  genuine issue of material fact precludes entry of judgment. Comite de Jornaleros de Redondo

15  Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011), cert. denied, 132 S.Ct. 1566

16  (quotation marks and citation omitted).   The Court determines only whether there is a genuine

17  issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a pro se

18  prisoner.   Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations

19  omitted).

20                                      **III.**

21                                  **DISCUSSION**

22      **A.      Plaintiff's Allegations**

23      Plaintiff was incarcerated at the California Substance Abuse and Treatment Facility

24  ("SATF"), a level four maximum security prison, in Corcoran, California during the events at

25  issue.   Plaintiff was housed in housing Facility C, which is comprised of eight identical housing

26  units.   Plaintiff's housing unit was placed on lockdown from July 25, 2008 to October 22, 2008

27  and then again from November 18, 2008 to January 29, 2009. (Pl's Am. Compl. at 3, ECF No.

28

1   10.)[3] During these time periods, Plaintiff was deprived of any access to outdoor exercise. (Id.)

2   Plaintiff suffered headaches, muscle cramps, back pains, anxiety, depression, stress, and fatigue

3   as a result of the outdoor exercise deprivation. (Id.)

4          Plaintiff alleges the lockdowns were caused "because of a state initiated racial riot

5   involving African American and caucasian inmates." (Id..) On July 9, 2009, a Caucasian crip

6   inmate arrived at release and receiving at SATF. (Id.) This inmate was housed with an African

7   American inmate in housing Facility C. (Id.) Prison officials appeared at this inmate's cell

8   alleging they had information that Caucasian inmates would assault this Caucasian crip at the

9   first opportunity and also assault any African-American inmate who would assist him. (Id. at 3,

10  5.) On approximately July 20, 2008, the Caucasian crip's cell-mate was released to the normal

11  program, but the Caucasian crip was confined to his cell by the classification committee. (Id. at

12  5.)

13         The prison officials allegedly knew of the hit on this Caucasian crip, but they released

14  him to the prison yard on July 25, 2008, in order to provoke a racial riot. (Id.) Caucasian

15  inmates aggressed upon the Caucasian crip and other African-American inmates. (Id.) This

16  incident resulted in several inmates receiving serious and minor injuries and the entire facility

17  being placed on lockdown status. Hispanic and Other inmates were released to normal program

18  on approximately August 25, 2008, but African-American inmates remained on lockdown status

19  until October 22, 2008. (Id.) Plaintiff alleges that prison official had the means to provide

20  alternative outdoor exercise through the use of the "mini concrete yards", but they refused to do

21  so. (Id.)

22         The second lockdown period began on November 18, 2008, and lasted until January 29,

23  2009. (Id. at 6.) Plaintiff alleges that prison officials had information that Caucasian inmates

24  would attack African-American inmates at first opportunity. (Id.) Regardless, prison officials

25  released African-American inmates along with Caucasian inmates into normal program on

26  November 18, 2008. (Id.) "Holding true to the information that staff possessed," two Caucasian

27

28         [3] In the interest of clarity, page numbers in record citations will always refer to the page number in the upper left-hand corner of ECF documents.

inmates attacked an African-American inmate and Facility C returned to lockdown status.  (Id.)

Throughout the November lockdown, prison officials allegedly staged several more altercations

as a means to provoke African-American inmates to initiate attacks on Caucasians, as "a means

to continue their deprivation."  (Id.)  For example, on December 24, 2008, officers placed a

Caucasian inmate inside of a holding cell that was allegedly occupied by an African-American

inmate.  (Id.)  The officials removed the handcuffs of the Caucasian inmate and said, "Handle

your business," a term meaning to engage physically.  (Id. at 7.)  Again, on January 26, 2009,

prison officials released two Caucasian inmates who immediately aggressed upon an African-

American inmate.  (Id.)

Plaintiff alleges that prison officials "staged each of the incidents alleged as a means to

deprive inmates the right to outdoors exercise, which deprivation was carried out in bad faith,

with the intent to punish."  (Id.)   Prison officials were aware of the deprivation because Plaintiff

submitted sick call slips concerning the headaches, muscle cramps, back pains, stress,

depression, and fatigue he suffered as a result of the lockdowns.  (Id.)

### B.      Eighth Amendment Legal Standard

Section 1983 provides a cause of action for the violation of constitutional or other federal

rights by persons acting under color of state law.  Nurre v. Whitehead, 580 F.3d 1087, 1092 (9th

Cir. 2009), cert. denied, 130 S.Ct. 1937; Long v. Cnty. of L.A., 442 F.3d 1178, 1185 (9th Cir.

2006); Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).  Under section 1983, Plaintiff must

demonstrate a link between the actions or omissions of each named defendant and the violation

of his rights.  Ashcroft v. Iqbal, 556 U.S. 662, 676-77, 129 S.Ct. 1937 (2009); Simmons v.

Navajo Cnty., Ariz., 609 F.3d 1011, 1020-21 (9th Cir. 2010); Ewing v. City of Stockton, 588

F.3d 1218, 1235 (9th Cir. 2009); Jones, 297 F.3d at 934.

The Eighth Amendment's prohibition against cruel and unusual punishment protects

prisoners not only from inhumane methods of punishment but also from inhumane conditions of

confinement.  Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing Farmer v.

Brennan, 511 U.S. 825, 847, 114 S.Ct. 1970 (1994) and Rhodes v. Chapman, 452 U.S. 337, 347,

101 S.Ct. 2392 (1981)) (quotation marks omitted).  While conditions of confinement may be, and

often are, restrictive and harsh, they must not involve the wanton and unnecessary infliction of pain.  Morgan, 465 F.3d at 1045 (citing Rhodes, 452 U.S. at 347) (quotation marks omitted).

Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety, Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000) (quotation marks and citations omitted), but not every injury that a prisoner sustains while in prison represents a constitutional violation. Morgan, 465 F.3d at 1045 (quotation marks omitted).  To maintain an Eighth Amendment claim, inmates must show deliberate indifference to a substantial risk of harm to their health or safety. E.g., Farmer, 511 U.S. at 847;  Thomas v. Ponder, 611 F.3d 1144, 1151-52 (9th Cir. 2010); Foster v. Runnels, 554 F.3d 807, 812-14 (9th Cir. 2009); Morgan, 465 F.3d at 1045; Johnson, 217 F.3d at 731; Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).  Deliberate indifference is shown  where a prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer, 511 U.S. at 847.  Prison officials' duty under the Eighth Amendment is to ensure reasonable safety, and prison officials may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. Farmer, 511 U.S. at 847 (quotation marks and citations omitted).

Inmates have a constitutional right to exercise and the denial of out-of-cell exercise for an extended period of time is sufficiently serious to state a claim under the Eighth Amendment. Thomas, 611 F.3d at 1151-52.  No bright line exists in terms of how many hours of out-of-cell exercise per week satisfy the Constitution.  Noble v. Adams, 646 F.3d 1138, 1139-41 (9th Cir. 2011) (no outdoor exercise or other privileges for approximately sixteen months); Hebbe v. Pliler, 627 F.3d 338, 343-44 (9th Cir. 2010) (inmate permitted out of his cell for only eight hours a week and impermissibly required to choose between exercise and law library access during those hours); Thomas, 611 F.3d at 1151-52 (no out-of-cell exercise for thirteen months); Pierce v. Cnty. of Orange, 526 F.3d 1190, 1211-13 (9th Cir. 2008) (at least two days a week for at least two hours total per week sufficient exercise); LeMaire, 12 F.3d at 1457-58 (no out-of-cell exercise for most of a five-year period); Allen v. Sakai, 48 F.3d 1082, 1087 (9th Cir. 1994) (in-cell confinement for almost twenty-four hours a day and forty-five minutes of outside exercise

6

per week for a six-week period); Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979) (fewer than five hours of exercise per week and no outdoor exercise for some inmates over a period of years). Short-term, temporary deprivations of exercise without medical effects are not sufficiently serious to support an Eighth Amendment claim, Thomas, 611 F.3d at 1155; Norwood, 591 F.3d 1062, 1070 (9th Cir. 2010); May v. Baldwin, 109 F.3d 557, 565 (9th Cir. 1997); Allen, 48 F.3d at 1088, but the deprivation of exercise for a period of six weeks can support a claim, Allen, 48 F.3d at 1088.

### C.  Undisputed Facts

1.      Plaintiff is an inmate in the custody of the California Department of Corrections and Rehabilitations (CDCR). (Norwood Depo. 6:10-7:1.)

2.      At all times relevant to this suit, Plaintiff was housed in Facility C of the California Substance Abuse and Treatment Facility (SATF) in Corcoran, California. (Norwood Depo. 9:15-16.)

3.      Currently, Plaintiff is incarcerated at Calipatria State Prison. (Norwood Depo. 63:13-16.)

4.      At all times relevant to this suit, Defendant Clark was the Warden at SATF. (Clark Decl. ¶ 1.)

5.      At all times relevant to this suit, Defendant Allison was the Chief Deputy Warden at SATF.(Allison Decl. ¶ 1.)

6.      At all times relevant to this suit, Defendant Wan was an Associate Warden at SATF. (Wan Decl. ¶ 1.)

7.      At all times relevant to this suit, Defendant Reynoso was the Facility C Captain at SATF.(Reynoso Decl. ¶ 1.)

8.      From 2007 to 2010, Defendant Sullivan was the Associate Director for CDCR over SATF. Sullivan is retired. (Sullivan Decl. ¶ 1.)

9.      Defendants do not have any authority or control over Plaintiff or the day-to-day operations of Calipatria State Prison. (Sullivan Decl. ¶ 1; Clark Decl. ¶ 1; Allison Decl. ¶ 44; Wan Decl. ¶ 42; Reynoso Decl. ¶ 1.)

10.     Plaintiff is challenging the duration of two modified programs at SATF. (Clerk's Record 11 p. 1.)

11.     The first modified program, which lasted 92 days, was in effect from July 25, 2008, to October 25, 2008.[4] (Allison Decl. Ex. A pp. 1-35.)

12.     The second modified program, which lasted 72 days, was in effect from November 18 2008, to January 29, 2009. (Allison Decl. Ex. A pp. 36-55.)

13.     Facility C is comprised of eight identical housing units (C1 through C8), each containing sixty-four cells. In 2008, SATF's C-Facility housed approximately 1200 Level IV general population inmates. (Clark Decl. ¶ 7; Allison Decl ¶ 7.)

14.     Based on an inmate's commitment offense and in-prison behavior, inmates classified as Level IV pose the highest security level threat. (Clark Decl. ¶ 7; Allison Decl. ¶ 7.)

15.     The majority of the inmates housed on Facility C were housed there because they had demonstrated through their institutional behavior that they needed higher levels of custodial supervision than other Level IV inmates. (Clark Decl. ¶ 7; Allison Decl. ¶ 7.)

16.     Normal programming at a prison means inmates attend work and education programs; have regular visiting, canteen, and telephone privileges; can attend the law library and religious services; and are released to the yard for recreation in large groups according to their yard schedule. During normal programming, approximately 130 inmates at a time were permitted access to the yard for outdoor exercise. (Clark Decl. ¶ 8; Allison Decl. ¶ 8; Wan Decl. ¶ 8; Reynoso Decl. ¶ 8.)

Background on Modified Programing

17.     CDCR policies and procedures direct that when a serious incident occurs, the priorities are to: (1) isolate, contain, and control the situation to the smallest possible area; (2) provide medical attention to all injured persons; (3) preserve all available evidence; (4) identify all involved persons; and (5) complete and submit appropriate written documentation and reports within the designated time frames. Defendants always complied with, and directed their

---

[4] Plaintiff alleges that this lockdown ended instead on October 22, 2008.  (ECF No. 18.)  However, the exact date is not important for purposes of resolving this motion for summary judgment.

subordinate staff to comply with, these directives. (Clark Decl. ¶ 9; Allison Decl. ¶ 9; Wan Decl. ¶ 9; Reynoso Decl. ¶ 9.)

18.     After the initial incident response is completed, the incident is assessed to determine whether it is necessary to modify or restrict programming activities for some or all inmates. If the incident is serious, it may be necessary to modify or restrict program activities for some or all inmates by: (1) declaring a State of Emergency; (2) locking down an entire facility or portions of a facility; or (3) placing some or all of the facility on a modified program. (Clark Decl. ¶ 11; Allison Decl. ¶ 11; Wan Decl. ¶ 11; Reynoso Decl. ¶ 11.)

19.     A modified program typically involves the suspension of various programs and services for a specific group of inmates or a specific part of a facility. Modified programs are necessary when correctional staff discover evidence or receive information that violence or disruptions are being planned by some inmates against other inmates or staff, or that there exists a serious threat to institutional security or the safety of inmates and staff. Work and education programs, visiting and dayroom privileges, and outdoor yard time may be temporarily suspended; telephone, canteen, and religious programming may be restricted. Essential services, including medical services, mental health services, and hygiene, are maintained. The modified program plan is reviewed regularly and revised as necessary. (Clark Decl. ¶ 10; Allison Decl. ¶ 10; Wan Decl. ¶ 10; Reynoso Decl. ¶ 10.)

20.     When a group of inmates commit an assault, staff must determine whether the assault was an isolated incident or the beginning of a coordinated campaign of violence involving many inmates. (Clark Decl. ¶ 13; Allison Decl. ¶ 13; Wan Decl. ¶ 13; Reynoso Decl. ¶ 13.)

21.     All breaches of security, threats of violence, and disruptions are taken seriously, but there is greater concern if there is evidence or information that an assault or threat to safety or institutional security may be part of a greater scheme because it could lead to a larger-scale incident or security breach, creating a more serious threat to the safety and security of the prison. Staff must determine the likelihood that future violence will occur and the nature and causes of the violence. (Clark Decl. ¶ 14; Allison Decl. ¶ 14; Wan Decl. ¶ 14; Reynoso Decl. ¶ 14.)

22.    At all times relevant to this suit, striking the right balance between ensuring institutional security and the safety of staff and inmates, and returning inmates to regular exercise and normal programming as soon and as safely possible, was difficult. (Clark Decl. ¶ 12; Allison Decl. ¶ 12; Wan Decl. ¶ 12; Reynoso Decl. ¶ 12.)

23.    CDCR implements lockdowns and modified programs when they are necessary to maintain safety and security in the prisons, and to protect the lives of inmates and staff. Decisions to implement lockdowns or modified programs are usually based on numerous situation-specific facts. Only by evaluating incidents on a case-by-case basis can prison officials determine when a prison must be locked down or a group of inmates placed on a modified program; when normal programs, including outdoor exercise, should be suspended for particular inmates; or when and how normal programming can be safely resumed. Setting the parameters of the group of inmates subject to modified programming is always situation-specific. The intention is to be neither under inclusive nor over inclusive, but to set the limit necessary to facilitate investigational tasks, and implement measures best designed to ensure the safety and security of the prison's staff, its inmates, and the institution as a whole, without needlessly interrupting the programming of inmates who were not involved. (Clark Decl. ¶ 15; Allison Decl. ¶ 15; Wan Decl. ¶ 15; Reynoso Decl. ¶ 15.)

24.    Typically, after a precipitating incident, the lockdown committee meets, assesses the risk to institutional safety and security, and determines what areas of the prison are affected, which investigations must be conducted, whether to interview staff and inmates, and how to collect relevant intelligence. The committee then submits a recommendation, which may include a request to institute a modified program. The Warden, or his designee, approves or rejects the recommendation. (Clark Decl. ¶ 16; Allison Decl. ¶ 16; Wan Decl. ¶ 16; Reynoso Decl. ¶ 16.)

25.    CDCR's policy is to return to normal programming as soon as it is safe to do so. Gathering information about the cause(s) of violence, any significant security breaches that have occurred, or the plans for committing acts of violence, is imperative so that prison staff can determine how and when to resume normal programming and avoid further incidents. Once the

inmates who instigated the incident have been identified and removed from the general population and correctional staff have determined it is safe to resume normal programming, a phased unlock may begin. An unlock plan is developed to return to full programming. During the phased unlock, inmates are released, and privileges restored, incrementally. A determination is made regarding the inmates most likely to program successfully. Small groups of inmates may be released so that staff can monitor their conduct in a controlled environment and evaluate whether the planned unlock can proceed safely. (Clark Decl. ¶ 17; Allison Decl. ¶ 17; Wan Decl. ¶ 17; Reynoso Decl. ¶ 17.)

26.     Once a modified program is implemented, the process of investigating and gathering intelligence begins. The investigation process can be slow, time-consuming, and labor intensive. Inmates and facility staff and are interviewed to gather intelligence about the incident and to determine whether it is safe to return to normal programming. Inmates often must be interviewed more than once because they are reluctant to speak with or disclose information to correctional staff. The yards, cells, common areas, and other areas of the prison are searched thoroughly for evidence, weapons, and contraband. Mail is screened for any information concerning planned violence. Each piece of evidence and information obtained from either a search or interview is examined and all leads are followed, which often creates the need for additional searches and interviews. (Clark Decl. ¶ 18; Allison Decl. ¶ 18; Wan Decl. ¶ 18; Reynoso Decl. ¶ 18.)

27.     The fact that an inmate was not housed in a particular housing unit where the incident underlying the modified program occurred does not change the fact that  every inmate within the scope of the modified program must be investigated. (Clark Decl. ¶ 19; Allison Decl. ¶ 19; Wan Decl. ¶ 19; Reynoso Decl. ¶ 19.)

28.     During a modified program, there are weekly mandatory meetings with the Warden or designee, Chief Deputy Warden, Facility Captain, Associate Warden, the Institutional Gang Investigation Unit, and any line staff member with relevant information. The attendees discuss the progress of the investigation, the status of the modified program, and the

1   development of a plan to resume normal programming. (Clark Decl. ¶ 20; Allison Decl. ¶ 20;

2   Wan Decl. ¶ 20; Reynoso Decl. ¶ 20.)

3        29.    The Associate Director of Institutions for CDCR is apprised of the status of the

4   lockdown via weekly Program Status Reports and bi-weekly conference calls. (Clark Decl. ¶ 20;

5   Allison Decl. ¶ 20; Wan Decl. ¶ 20; Reynoso Decl. ¶ 20.)

6        30.    Staff also communicates regularly with other institutions and with CDCR

7   Headquarters to compare intelligence, determine whether the threat is an isolated event or part of

8   a larger plan, and determine whether it is safe to return to normal programming. Other

9   institutions may also interview their inmates and monitor inmate communications for related

10  intelligence. (Clark Decl. ¶ 20; Allison Decl. ¶ 20; Wan Decl. ¶ 20; Reynoso Decl. ¶ 20.)

11       31.    The risk associated with lifting modified programming prematurely, is that further

12  incidents of violence can occur. For example, there have been instances at SATF and other

13  prisons where inmates and correctional staff members were injured as a result of prison officials

14  being unable to fully identify all of the inmates involved in an incident due to obstacles that

15  include inmates not cooperating in investigations, or inmates providing incomplete or inaccurate

16  information. Defendants were not, and are not willing to subject either inmates or correctional

17  staff to unreasonable levels of danger in an effort to rush back to normal programming. (Clark

18  Decl. ¶ 21; Allison Decl. ¶ 21; Wan Decl. ¶ 21; Reynoso Decl. ¶ 21.)

19       32.    Among all of the programming activities that are suspended during a modified

20  program, it is most difficult to determine when exercise programs can safely be resumed.

21  Following a phased unlock, violence is most likely to occur on an exercise yard. Inmates have the

22  greatest access to each other on the exercise yards, which is typically where most assaults occur.

23  Self-imposed ethnic divisions are especially pronounced on the exercise yards because the

24  various ethnic groups often claim areas of the yard as their turf. The number of inmates on a yard

25  greatly outnumbers the correctional staff members assigned to monitor the area. (Clark Decl. ¶

26  24; Allison Decl. ¶ 24; Wan Decl. ¶ 24; Reynoso Decl. ¶ 24.)

27       33.    Until the investigation during the modified program identified and resolved the

28

threat to safety and institutional security, the small concrete exercise yards were not an alternative to the main exercise yard. If inmates are released prematurely from the modified program, they could be subject to assaults, or coercion, or forced to hide inmate-manufactured weapons. The relevant inquiry is when inmates can safely resume outdoor exercise, not where inmates can attend outdoor exercise under an unreasonable risk of harm. (Clark Decl. ¶ 25; Allison Decl. ¶ 25; Wan Decl. ¶ 25; Reynoso Decl. ¶ 25.)

34.    The investigation process is delayed when weapons are discovered during the searches. The discovery of weapons creates additional issues that must be evaluated, including but not limited to, where the weapons came from, how they were made, why they were gathered, and their intended targets. (Clark Decl. ¶ 26; Allison Decl. ¶ 26; Wan Decl. ¶ 26; Reynoso Decl. ¶ 26.)

35.    If another incident occurs during the unlock process, previously restored programs may be rescinded so that an investigation of the new incident can be completed. If it is determined that returning the inmates to normal programming would pose too great a risk, the modified program may be continued. While some of the evidence gathered during the prior investigation is helpful, prison officials need to conduct a new investigation and assess the nature, scope, and duration of the most recent threat to safety and institutional security. (Clark Decl. ¶ 27; Allison Decl. ¶ 27; Wan Decl. ¶ 27; Reynoso Decl. ¶ 27.)

36.    Inmates associate along racial lines. Members of each racial group tend to congregate and associate exclusively among those belonging to their own racial group. A Level IV general population is highly structured by prison and street gangs and an organized effort between races on these types of facilities is rare. Such organized efforts are usually carried out by members of a single racial group working together. Further, it is not uncommon for inmates to hide or pass weapons, or attempt to carry out an assault, for another inmate. And inmates who are not affiliated with a gang often are pressured by gang members to assist them in violent activities. (Clark Decl. ¶ 28; Allison Decl. ¶ 28; Wan Decl. ¶ 28; Reynoso Decl. ¶ 28.)

37.    Incidents that begin without racial animus often take on racial overtones. For

example, a fight between two inmates of different races that has nothing to do with race may be interpreted by other inmates as an act calling for retaliation against members of a participant's racial group. (Clark Decl. ¶ 29; Allison Decl. ¶ 29; Wan Decl. ¶ 29; Reynoso Decl. ¶ 29.)

38.     Inmates planning violence often target and threaten inmates of their same race. For example, when inmates planning violence realize that facility searches are ongoing and that the weapons they have hidden will eventually be discovered and confiscated, they sometimes threaten violence against other inmates of their same race to coerce them to move or hide weapons to prevent them from being discovered, or to assault other inmates or staff. If the innocent inmate does not comply, the threats of violence may be carried out against him. Consequently, it is sometimes necessary to lock down or place on modified program, inmates who may be innocent in the triggering incident, in order to protect them from members of their own race. (Clark Decl. ¶ 30; Allison Decl. ¶ 30; Wan Decl. ¶ 30; Reynoso Decl. ¶ 30.)

39.     For the reasons outlined above, limiting the scope of a modified program to specific inmates known to be directly involved in an incident is often inadequate to ensure the safety of all inmates and staff. Thus, restrictions via modified programs placed on a particular racial or ethnic group sometimes is necessary until prison officials can determine whether the incident has a racial component or will likely to lead to broader racial or ethnic violence. (Clark Decl. ¶ 31; Allison Decl. ¶ 31; Wan Decl. ¶ 31; Reynoso Decl. ¶ 31.)

40.     It is more difficult, labor intensive, and expensive to operate a prison during a modified program. Typically, inmates are fed together in the dining halls, assist staff during work assignments, and can report to the showers and some medical appointments without an escort. During a modified program, correctional staff members must deliver all meals to each inmate's cell, most work assignments are suspended, and inmates must be escorted to showers and medical appointments. (Clark Decl. ¶ 32; Allison Decl. ¶ 32; Wan Decl. ¶ 32; Reynoso Decl. ¶ 32.)

Defendants' Roles Regarding the Modified Programs

41.     At all times relevant to this suit, Warden Clark was the only correctional staff

1  member at SATF with the power modify or terminate the modified programs. (Clark Decl. ¶¶ 2-

2  6; Allison Decl. ¶¶ 2-6.)

3      42.    Warden Clark implemented, adjusted, and terminated the modified programs in

4  this case. (Clark Decl. ¶¶ 2-6; Allison Decl. ¶¶ 3, 6.)

5      43.    While Chief Deputy Warden Allison was delegated with the approval of Program

6  Status Reports for the modified programs, she was not delegated with or designated by Warden

7  Clark to make decisions on adjustments to or terminations of the modified programs at issue in

8  this case. (Clark Decl. ¶ 5; Allison Decl. ¶ 2.)

9      44.    With respect to the modified programs at issue, Associate Warden Wan

10  participated in bi-weekly meetings to discuss the progress of investigations into the incidents that

11  triggered the modified programs, the status of the modified program, and the development of a

12  plan to resume normal programming. Wan did not have the authority to decide whether to modify

13  or terminate the modified programs. (Clark Decl. ¶¶ 2-6; Wan Decl. ¶ 5.)

14      45.    As the Facility Captain for Facility C at SATF, Reynoso participated in bi-weekly

15  meetings to report on operations in the facility where the modified program was in place, and to

16  discuss the progress of investigations, and the development of a plan to resume normal

17  programming. Reynoso did not have the authority to decide whether to modify or terminate the

18  modified programs. (Clark Decl. ¶¶ 2-6; Reynoso Decl. ¶¶ 3-6.)

19      46.    Reynoso also was tasked with preparing the Program Status Reports which

20  advised staff and inmates on the status of the modified programs, based on information dictated

21  by Warden Clark, which reports would then be approved by Defendant Allison. Reynoso did not

22  have the authority to decide whether to modify or terminate the modified programs. (Reynoso

23  Decl. ¶¶ 3-6.)

24      47.    As an Associate Director of Institutions, Sullivan was apprised of the conclusions

25  and supporting facts of correctional staff at the prisons, including in this case, SATF, by way of

26  weekly Program Status Reports and bi-weekly conference calls in which he would participate.

27  Sullivan relied upon the investigations, analysis, and opinions of the qualified staff at SATF.

28

1 (Sullivan Decl. ¶¶ 2-3.)

2       The Implementation and Continuation of the July 25, 2008 Modified Program

3       48.     On July 25, 2008, a riot occurred on a Facility C recreation yard, involving

4 approximately twenty-two African-American inmates and six Caucasian inmates. Responding

5 staff needed pepper spray to stop the incident. Due the magnitude of the incident, additional staff

6 from other facilities was called in to stop the violence. One inmate was transported to an outside

7 hospital for further medical treatment due to serious bodily injuries. During the search of the

8 crime scene, staff found an inmate-manufactured weapon. Prison officials at SATF concluded

9 that normal programming activities posed an unacceptable risk of renewed violence until the

10 causes of the violence were investigated, discovered, and resolved. Thus, all of the inmates in

11 Facility C were immediately placed on a modified program to protect both inmates and staff from

12 serious bodily injuries or death. (Clark Decl. ¶ 37a; Allison Decl. ¶ 37a, Ex. A p. 1.)

13      49.     Plaintiff does not have any personal knowledge regarding the cause of the riot on

14 July 25, 2008. (Norwood Depo. 42:25-44:4, 46:18-21.)

15      50.     On July 25, 2008, a lockdown meeting was held, and correctional staff determined

16 that it was necessary to search the entire facility and interview inmates to assess the cause of the

17 violence and locate any additional weapons, weapons stock, or other contraband. Because SATF

18 could not ascertain the nature of the threat until the investigation was completed, the members of

19 the lockdown meeting concluded that restarting normal programming posed an unacceptable risk

20 of renewed violence. (Clark Decl. ¶ 37b; Allison Decl. ¶ 37b, Ex. A p. 2.)

21      51.     On July 29, 2008, correctional counselors began the process of interviewing

22 approximately 125 Facility C inmates. (Clark Decl. ¶ 37c; Allison Decl. ¶ 37c, Ex. A p. 4.)

23      52.     On August 12, 2008, correctional staff completed the search of Facility C, which

24 resulted in the location and confiscation of approximately seven inmate-manufactured weapons.

25 (Clark Decl. ¶ 37d; Allison Decl. ¶ 37d.)

26      53.     On August 13, 2008, the initial searches and interviews in Facility C were

27 completed. Through the interviews, staff learned that the riot started as an incident between

28

Caucasian inmates. An unidentified group of Caucasian inmates did not want a new Caucasian inmate, who was affiliated with the Crips disruptive group, to program with them. Accordingly, on July 25, 2008, two Caucasian inmates attempted to assault the new Caucasian inmate on the recreation yard. African-American inmates intervened and attacked the two Caucasian inmates. At which point, other Caucasian inmates rushed to the scene and started to attack the African-American inmates, which led to a riot between approximately twenty-eight inmates. Based upon this information, Hispanic and Other inmates were allowed access to dayroom activities and telephone calls. (Clark Decl. ¶ 37e; Allison Decl. ¶ 37e, Ex. A p. 7.)

54.     On August 14, 2008, correctional staff members met with members of the Inmate Advisory Committee (IAC), which consisted of inmate representatives from the different racial and ethnic groups at SATF. The IAC representatives advised staff that they believed the inmate population were ready to safely return to normal programming. Correctional staff, however, also received reports from other inmates that unidentified members of the Caucasian and African-American inmate populations were "stand-offish," and posed a serious threat of retaliatory or continued violence. Based upon the continued threat of violence, Caucasian and African-American inmates in Facility C remained on a modified program, pending the continuing efforts to assess, identify, and remove the cause of the violence. (Clark Decl. ¶ 37f; Allison Decl. ¶ 37f, Ex. A p. 8.)

55.     On August 19, 2008, Hispanic and Other inmates started using the canteen and quarterly packages. (Allison Decl. Ex. A p. 9.)

56.     On August 21, 2008, based upon the safe and successful reinstatement of some normal programming activities to Hispanic and Other inmates, SATF began the incremental restoration of the outdoor exercise program for Hispanic and Other inmates. (Allison Decl. Ex. A p. 10.)

57.     On August 23, 2008, correctional counselors completed a second round of interviews, with approximately ninety inmates in Facility C, as they attempted to assess whether there was continued tension between Caucasian and African-American inmates. (Clark Decl. ¶

37g; Allison Decl. ¶ 37g.)

58.     On August 25, 2008, outdoor exercise programs were expanded for Hispanic and Other inmates. In order to diffuse tensions and disseminate facts regarding the modified program, Caucasian and African-American IAC representatives, were permitted restrained access to the housing units in Facility C. (Allison Decl. Ex. A p. 11.)

59.     On August 27, 2008, Hispanic and Other inmates began to return to a normal program. (Allison Decl. Ex A p. 12.)

60.     On approximately August 27, 2008, two Southern Hispanic inmates advised correctional staff they believed that Caucasian and African-American inmates continued to have tension between them. One of the reporting inmates claimed that a prisoner at another prison wrote him a letter that warned him to stay out of the conflict between Caucasian and African-American inmates. Correctional staff investigated these claims, including contacting several prisons to assess the risk of renewed violence; but, the investigation did not reveal any evidence of a letter being processed to the reporting inmate. (Clark Decl. ¶ 37h; Allison Decl. ¶ 37h.)

61.     On August 29, 2008, Caucasian and African-American IAC representatives safely interacted with each other at an IAC meeting. (Clark Decl. ¶ 37i; Allison Decl. ¶ 37i.)

62.     On September 3, 2008, the modified program was adjusted to implement the calculated release of Caucasian and African-American inmates to normal programming. A small and equal number of Caucasian and African-American inmates returned to work, and IAC members were permitted to meet without mechanical restraints to discuss IAC business on the Program Office patio under the supervision of Facility C staff members. (Clark Decl. ¶ 37j; Allison Decl. ¶ 37j, Ex. A p. 14.)

63.     On September 4, 2008, another IAC meeting occurred without incident. Accordingly, IAC members were permitted to travel unrestrained between housing units to disseminate the facts regarding the modified program and restoration of normal programming activities to the inmate population. During the IAC meetings, Caucasian and African-American IAC representatives advised staff that the modified program helped diffuse the tension between

Caucasian and African-American inmate population. (Clark Decl. ¶ 37k; Allison Decl. ¶ 37k, Ex. A p. 15.)

64.     On September 8, 2008, Caucasian and African-American critical workers returned to their jobs in the laundry, education, and law library. (Allison Decl. Ex. A p. 16.)

65.     On September 9, 2008, Hispanic and Other inmates returned to a normal program. (Allison Decl. Ex. A p. 17.)

66.     On September 11, 2008, Caucasian and African-American inmates began reporting to work and medical appointments unrestrained. (Allison Decl. Ex. A p. 18.)

67.     On September 15, 2008, Caucasian and African-American inmates started traveling to the showers escorted but unrestrained. (Allison Decl. Ex. A p. 19.)

68.     On approximately September 16, 2008, the Investigative Services Unit intercepted a letter from an African-American inmate said there was still a lot of racial tension between Caucasian and African-American inmates, and if the modified program ended, there would be fighting between the two groups. Based upon this information, all of the inmates in Facility C were placed back on modified program until staff could identify and assess the threat of violence. Correctional staff initiated a new series of interviews and searches, which later resulted in the discovery of weapons, weapons stock, and cellular phones. (Clark Decl. ¶ 37l; Allison Decl. ¶ 37l, Ex. A pp. 22, 24.)

69.     Based upon the information gathered during the investigation, on October 22, 2010, the modified program was modified to restore access to the recreational yard and visiting for all inmates, except for the Caucasian inmate population. (Allison Decl. Ex. A pp. 20, 23-29.)

70.     On October 25, 2008, Plaintiff began to participate in outdoor exercise. (Norwood Depo. 27:13-22. 40:14-16, 41:10-11.)

71.     On November 12, 2008, correctional staff began the calculated release of Caucasian inmates starting with dayroom activities. (Clark Decl. ¶ 37j; Allison Decl. ¶ 37j, Ex. A pp. 30-34.)

72.     Based upon the success of the calculated release of Caucasian inmates, on

1   November 17, 2008, Caucasian and African-American inmates began to program together during

2   dayroom activities, telephone calls, and contact visits. (Norwood Depo. 42:5-6, Allison Decl. Ex.

3   A p. 35.)

4          The Implementation and Continuation of the November 18, 2998 Modified Program

5        73.    On November 18, 2008, shortly after the release to dayroom in Building C8, two

6   Caucasian inmates committed a battery of an African-American inmate, using a wooden cane.

7   The African-American inmate sustained multiple puncture wounds on his back, chest, and arms,

8   requiring treatment at an outside hospital. Correctional staff determined that an investigation was

9   necessary to assess the cause of the violence, which included the grounds for the attack, the

10  number of inmates planning violence, and whether this was an isolated incident or part of a larger

11  campaign of organized violence. Accordingly, all of Facility C was placed back on modified

12  program for a new series of searches and interviews to assess the nature, cause, and scope of the

13  threat. (Clark Decl. ¶ 37n; Allison Decl. ¶ 37n, Ex. A p. 36.)

14       74.    On November 19, 2008, Hispanic and Other critical workers returned to work.

15  (Allison Decl. Ex. A p. 37.)

16       75.    By November 22, 2008, correctional staff completed 143 interviews and a search

17  of the entire facility, which produced several inmate-manufactured weapons and two cellular

18  telephones. Through the interview process, correctional staff discovered that many inmates

19  misunderstood the facts regarding the November 18, 2008 assault, based upon false rumors. For

20  example, several African-American inmates reported that they believed the assaulted African-

21  American inmate was confined to a wheelchair when attacked, but that was not true. Based upon

22  this misunderstanding, correctional staff were concerned that an unidentified number of African-

23  American inmates might be planning retaliatory acts of violence against the Caucasian inmates.

24  Accordingly, correctional staff investigated the threat and started working with the IAC to dispel

25  the false rumors, diffuse any tensions, and maintain an avenue for communicating with all of the

26  inmate population. (Clark Decl. ¶ 37o; Allison Decl. ¶ 37o, Ex. A pp. 43, 51.)

27       76.    On December 3, 2008, ISU intercepted a note congratulating the two assailants for

28

their successful battery on an African-American inmate. Caucasian and African-American inmates were allowed separate canteen, quarterly packages, and non-contact visits in restraints. (Clark Decl. ¶ 37p; Allison Decl. ¶ 37p.)

77.     On December 3, 2008, Hispanic and Other inmates returned to normal program. (Allison Decl. Ex. A p. 51.)

78.     On December 7, 2008, ISU received evidence that an unidentified group of African-American inmates were targeting an unidentified group of Caucasian inmates for a retaliatory assault. (Allison Decl. Ex. A p. 51.)

79.     On December 14, 2008, ISU intercepted a letter from an African-American inmate stating that Caucasian and African-American inmates were headed toward a "full blown race war." Subsequent interviews by ISU confirmed there were tensions between the Caucasian and African-American inmate population, but staff could not confirm that African-American inmates were organizing coordinated acts of violence. (Clark Decl. ¶ 37q; Allison Decl. ¶ 37q.)

80.     On December 17, 2008, Caucasian and African-American inmates, age forty-five and older, started using the showers and attending medical appointments unescorted. (Allison Decl. Ex. A p. 41.)

81.     On December 23, 2008, Caucasian and African-American inmates, age thirty-five and older, were permitted to move unrestrained during daily activities. But due the continued risk of violence, outdoor exercise or dayroom activities were not restored for either Caucasian or African-American inmates. (Allison Decl. Ex. A p. 46.)

82.     On December 24, 2008, a physical altercation occurred between Caucasian and African-American inmates in a holding cell in the Facility C medical clinic. Accordingly, the Caucasian and African-American inmate populations were both placed back on a full modified program while the nature, extent, and scope of the violence was investigated. (Allison Decl. Ex. A pp. 47-50.)

83.     On January 8, 2009, staff met with the IAC representatives for the Caucasian and African-American inmates. The meeting revealed that a large segment of the African-American

inmate population distrusted Caucasian inmates due to the two previous batteries against African-American inmates. (Allison Decl. Ex. A p. 51.)

84. On January 9, 2009, the Caucasian IAC representative told the African-American IAC representative that the December 24, 2008 incident in the Facility C medical clinic was not sanctioned and the Caucasian assailant acted on his own accord. (Clark Decl. ¶ 37r; Allison Decl. ¶ 37r.)

85. On January 13, 2009, staff prepared to release Caucasian and African-American inmates, ages forty-years and older, to the recreation yard. On the same date, a note was intercepted that said that the Caucasian and African-American inmates in Building C5 were going to "go off" during recreational yard. In addition, staff discovered evidence that indicated two African-American inmates were filing metal into weapons. Thus, the program status report for January 13, 2009, was rescinded, and staff began another investigation regarding the continued threat of violence between the Caucasian and African-American inmate population. (Clark Decl. ¶ 37s; Allison Decl. ¶ 37s.)

86. During the investigation, staff received reports that several African-American inmates promoting racial tension in building C3. On January 14, 2009, the staff learned the identity of two inmates suspected of promoting racial tension, and they were removed from the general population and placed in the prison's administrative segregation unit. (Clark Decl. ¶ 37t; Allison Decl. ¶ 37t.)

87. On January 21, 2009, during a supervised IAC meeting, the Caucasian IAC representative battered the African-American IAC representative without any provocation. (Allison Decl. Ex. A p. 54.)

88. On January 23, 2009, staff received a note that said an unidentified group of Caucasian inmates were planning to assault African-American inmates as soon as the modified program was lifted. (Clark Decl. ¶ 37u; Allison Decl. ¶ 37u.)

89. On January 24, 2009, staff overheard a Caucasian inmate tell someone that Caucasian inmates would attack African-Americans whenever they had the opportunity because

1   they were outnumbered. (Clark Decl. ¶ 37v; Allison Decl. ¶ 37v.)

2       90.    On January 26, 2009, based upon the totality of information gathered by

3   correctional staff, it was determined that an unidentified group of Caucasian inmates were the

4   aggressors, and Caucasian and African-American inmates could not safely program together.

5   Therefore, on January 27, 2009, African-American inmates returned to normal program, and

6   Caucasian inmates remained on modified program as staff continued to investigate and search for

7   the unidentified inmates planning and promoting violence. (Clark Decl. ¶ 37w; Allison Decl. ¶

8   37w, Ex. A p. 55.)

9       91.    During normal programming, Plaintiff did not use the canteen. (Norwood Dep.

10  15:18-23, 17:14-15.)

11      92.    During normal programming, Plaintiff did not have visitors. (Norwood Dep.

12  16:13-16, 17:20-21, 18:10-12.)

13      93.    During the modified programs, Plaintiff exercised in his cell. (Norwood Dep.

14  107:19-21.)

15      94.    Inside his cell, Plaintiff was capable of running in place, doing push-ups, sit-ups,

16  and jumping-jacks. (Norwood Dep. 108:21-109:6.)

17      **D.    Summary of Defendants' Position**

18      Defendants present four main arguments: 1) Defendants Allison, Wan, and Reynoso did

19  not "cause" Plaintiff's alleged injury as required for § 1983 liability, because they did not control

20  the duration or scope of the lockdowns; 2) all of the defendants are entitled to summary judgment

21  because the temporary restrictions on Plaintiff's access to outdoor exercise were reasonable

22  measures taken in response to particularized and credible threats to institutional safety and

23  security, and thus, did not violate Plaintiff's Eighth Amendment rights; 3) alternatively, all

24  defendants are entitled to qualified immunity from damages because there was no clearly

25  established right which a reasonable correctional official would have known they were violating;

26  and 4) Plaintiff's claims for injunctive relief are moot. (Memo. of P.&.A. in Supp. of Defs' Mot.

27  Summ J. at 8, ECF No. 45-1.)

28

1          1.     Causation as to Defendants Allison, Wan, and Reynoso

2          Defendants argue that judgment should be in favor of Defendants Allison, Wan, and

3   Reynoso because they did not control the duration or scope of the lockdowns, and therefore they

4   did not "cause" Plaintiff's alleged injury as required for § 1983 liability.  (ECF No.45-1 at 8.)

5   Defendants assert that at all times relevant to this suit, Defendant Clark was the only correctional

6   staff member at SATF with the authority to modify or terminate the modified programs. (ECF

7   No. 46-1 (Clark Decl. ¶¶ 2-6); Doc. 46-2 (Allison Decl. ¶¶ 2-6)). During times relevant to this

8   action, Defendant Clark implemented, adjusted, and terminated the lockdowns at SATF. (ECF

9   No. 46-1 (Clark Decl. ¶¶ 2-6); ECF No. 46-2 (Allison Decl. ¶¶ 3, 6)).

10          Defendant Allison was the Chief Deputy Warden at SATF. (ECF No. 46-2 (Allison Decl.

11   ¶ 1)).  Defendants assert that while Defendant Allison was delegated with the approval of

12   Program Status Reports for the modified programs, she was not delegated with or designated by

13   Warden Clark to make decisions on adjustments to or terminations of the lockdowns at issue in

14   this case. (ECF No. 46-1 (Clark Decl. ¶ 5); Doc. 46-2 (Allison Decl. ¶ 2).)

15          Defendant Wan was an Associate Warden at SATF. (ECF No. 46-4 (Wan Decl. ¶ 1)).

16   With respect to the lockdowns at issue, Defendant Wan participated in bi-weekly meetings to

17   discuss the progress of investigations into the incidents that triggered the modified programs, the

18   status of the modified program, and the development of a plan to resume normal programming.

19   (ECF No. 46-1 (Clark Decl. ¶¶ 2-6); Doc. 46-4 (Wan Decl. ¶ 5)). Defendant Wan did not have

20   the authority to decide whether to adjust or terminate the modified programs. (*Id.*)

21          Defendant Reynoso was the Facility Captain for Facility C at SATF, where the Plaintiff

22   was housed. (ECF No. 46-5 (Reynoso Decl. ¶ 1)). Defendant Reynoso participated in bi-weekly

23   meetings to report on operations in the facility where the modified program was in place, and to

24   discuss the progress of investigations, and the development of a plan to resume normal

25   programming. (ECF No. 46-1  (Clark Decl. ¶¶ 2-6); ECF No. 46-5 (Reynoso Decl. ¶¶ 3-6)).

26   Defendant Reynoso also prepared the Program Status Reports which advised staff and inmates on

27   the status of the modified programs, based on information dictated by Warden Clark, which

28

reports would then be approved by Defendant Allison. (ECF No. 46-5 (Reynoso Decl. ¶¶ 3-6)). Defendant Reynoso did not have the authority to adjust or terminate the modified programs. (ECF No. 46-1 (Clark Decl. ¶¶ 2-6); ECF No. 46-5 (Reynoso Decl. ¶¶ 3-6)).

            2.   Subjective Prong to Eighth Amendment Deliberate Indifference

        Defendants assert that "[b]ecause the Defendants' obligation to maintain order and protect inmates and staff from assaults takes precedence over the prison's outdoor exercise programs, and the reasonable measures they took through the [lockdowns] fulfilled that obligation, [Plaintiff]'s rights under the Eighth Amendment were not violated here." (ECF No. 45-1 at 29.) Defendants assert that Plaintiff's main argument is that Plaintiff should have been released from lockdown restrictions immediately after correctional staff had concluded their interview of him. (ECF No. 45-1 at 7.)   Although Plaintiff's argument is that the length of the lockdown period provides sufficient indicia of malice to satisfy the subjective prong of the deliberate indifference test, Defendants argue that such argument:

>  ignores the deference afforded correctional officials in their judgment as to how best to restore order to their prisons when violence occurs . . . . [and that] Plaintiff's theory also ignores that there is no controlling case that specifies how long a lockdown . . . can be continued before it rises to the level of an Eighth Amendment violation, or what the monitoring process must be in order for the lockdown or modified program to remain in place.

(ECF No. 45-1 at 7.)   Contrary to Plaintiff's assertions, Defendants argue that the lockdowns on July 25, 2008, and November 18, 2008, were: 1) not in excess of what was required to restore order; 2) were related to officials' security and safety duties; and 3) did not last for a time period that was longer than necessary to restore order and security. (ECF No. 45-1 at 7-8.)

            3.   Qualified Immunity

        Defendants argue that they are entitled to summary judgment because all defendants are entitled to qualified immunity from damages because there was no clearly established right which a reasonable correctional official would have known they were violating. "The Ninth Circuit has expressly recognized that, as of March 2011, it still had not yet been clearly established, 'precisely how according to the Constitution, or when a prison facility housing problem inmates must return to normal operations, including outside exercise.'" (ECF

1    No. 45-1 at 24.) (citing Noble v. Adams, 636 F.3d 525, 529).

2              4.    Mootness of Injunctive Relief

3         Defendants argue that Plaintiff's claims for injunctive relief are moot. (ECF No. 45-1 at

4    8.)  According to Defendants, Plaintiff is incarcerated at Calipatria State Prison. (ECF No. 46-7

5    at 22 (Alves Decl. at Ex. A, 63:13-16 (Excerpt of Pl's Decl.))). Defendants assert that they do not

6    have any authority or control over Plaintiff or the day-to-day operations of Calipatria State

7    Prison.  (ECF No. 45-1 at 8; ECF No. 46-6 (Sullivan Decl. ¶ 1); ECF No. 46-1 (Clark Decl. ¶ 1);

8    ECF No. 46-2 (Allison Decl. ¶ 42); ECF No. 46-4 (Wan Decl. ¶ 42); ECF No. 46-5 (Reynoso

9    Decl. ¶ 1)).

10        E.    Summary of Plaintiff's Position

11        In his amended opposition, Plaintiff argues that: 1) since Defendants did not remove from

12   the general population a Caucasian "Crip" inmate named Brandon Johnston, Defendants "staged

13   and provoked" the July 25, 2008, race riot which led to the lockdown and resulted in Plaintiff not

14   having outdoor exercise; 2) the length of time that it took for Defendants to investigate the July

15   25, 2008, outbreak of violence was a pretext since Defendants knew the cause of the violence

16   before it occurred; 3) Defendants had an alternate means of providing outdoor exercise to

17   prisoners through the mini concrete segregated housing unit yards, however, chose not to use

18   them; 4) it is disputed what time Defendants first knew that Caucasian inmates were ordered to

19   assault African-American inmates; 5) Defendants knew that Caucasian inmates would attack

20   African-American inmates and Defendants should not have continued to allow both races to

21   interact; 6) Defendants found an African-American inmate guilty in a disciplinary hearing and

22   sent him to administrative segregation as a means of covering up the fact that they knew

23   Caucasian inmates were the aggressors yet pretended they did not know who was the aggressor in

24   order to justify continuing lockdown-based investigations. (ECF No. 76 at 8-9, 55, 58.) Plaintiff

25   argues that Defendants' response in investigating the violence was deliberately "exaggerated" for

26   the purpose of inflicting harm to inmates by suspending their outdoor exercise. (ECF No. 76 at

27   9.)

28

                        26

1        F.        **Legal Analysis**

2        Defendants brought this motion for summary judgment regarding whether Defendants'

3   denial of outdoor exercise during lockdown periods violated Plaintiff's  Eighth Amendment

4   rights.  Liability under section 1983 exists where a defendant "acting under the color of law" has

5   deprived the plaintiff "of a right secured by the Constitution or laws of the United States."

6   Jensen v. Lane Cnty., 222 F.3d 570, 574 (9th Cir. 2000).  To constitute cruel and unusual

7   punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton

8   and unnecessary infliction of pain."   Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  In order to

9   be held liable each defendant must have personally participated in the deprivation of the

10  plaintiff's rights.  Ashcroft v. Iqbal, 556 U.S. 662, 677, 129 S. Ct. 1937, 1949 (2009); Jones v.

11  Williams, 297 F.3d 930, 934 (9th Cir. 2002).

12        The issues presented in Defendants' motion for summary judgment are whether any

13  genuine issue of material facts exist as to 1) whether Defendants Allison, Wan, and Reynoso

14  caused Plaintiff's deprivation; 2) whether Plaintiff's deprivation of outdoor exercise rises to the

15  level of an Eighth Amendment violation; 3) whether Defendants are entitled to qualified

16  immunity; and 4) whether Plaintiff's claim for injunctive relief is moot.

17        1.        42 U.S.C. § 1983 Causation

18        Section 1983 provides a cause of action against any person who, under color of state law,

19  "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any

20  rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983; Filarsky v.

21  Delia, 132 S. Ct. 1657, 1661 (2012); Nelson v. Campbell, 541 U.S. 637, 643 (2004); Nurre v.

22  Whitehead, 580 F.3d 1087, 1092 (9th Cir. 2009). "A person 'subjects' another to the deprivation

23  of a constitutional right, within the meaning of section 1983, if he does an affirmative act,

24  participates in another's affirmative acts, or omits to perform an act which he is legally required

25  to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740,

26  743 (9th Cir.1978). "In a § 1983 action, the plaintiff must also demonstrate that the defendant's

27  conduct was the actionable cause of the claimed injury. To meet this causation requirement, the

28

1    plaintiff must establish both causation-in-fact and proximate causation." Harper v. City of L.A.,

2    533 F.3d 1010, 1026 (9th Cir. 2008) (internal citations omitted). Proximate cause requires

3    "'some direct relation between the injury asserted and the injurious conduct alleged.'" Hemi

4    Group, LLC v. City of New York, 559 U.S. 1, 130 S.Ct. 983, 989, 991 (2010) (quoting Holmes

5    v. Secs. Investor Prot. Corp., 503 U.S. 258, 268 (1992)).

6          As employees of CDCR, Defendants acted under color of state law in executing the duties

7    of their positions relating to the implementation and continuation of lockdowns at SATF.

8    Defendants argue that judgment should be in favor of Defendants Allison, Wan, and Reynoso

9    because  they did not control the duration or scope of the lockdowns, and therefore they did not

10   "cause" Plaintiff's alleged injury as required for § 1983 liability.  (ECF No. 45-1 at 8.)

11   Defendants assert only Defendant Clark in his capacity as Warden, had the authority to modify or

12   terminate the lockdowns. (ECF No. 46-1 (Clark Decl. ¶¶ 2-6); ECF No. 46-2 (Allison Decl. ¶¶ 2-

13   6)).

14         Defendants Allison, Wan, and Reynoso "participate[d] in [Defendant Clark]'s affirmative

15   acts," through giving advice, expertise and recommendations to enable Defendant Clark to

16   approve of the scope and duration of the lockdowns. See Johnson v. Duffy, 588 F.2d 740, 743

17   (9th Cir.1978). Defendant Clark stated in his declaration that: 1) he considered the programming

18   recommendations and evidence provided by subordinate staff to assess the need for the

19   lockdowns and to determine when the lockdowns could safely end; 2) he relied upon the

20   investigations, analysis, and opinions of his staff regarding the status of any ongoing

21   investigations, the evidence collected, the effectiveness of the restrictions imposed as part of the

22   modified program, the likelihood that violence would occur without the restrictions in place, the

23   appropriateness of the scope of the restrictions, and the prospects and timetable for a phased

24   unlock to return to normal programming. (ECF No. 46-1 (Clark Decl. ¶¶ 2-6); ECF No. 46-2

25   (Allison Decl. ¶¶ 2-6)). It is clear that Defendants Allison, Wan, and Reynoso were a part of

26   Defendant Clark's decision making process to implement, continue and discontinue the

27   lockdowns. See Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir.1978); (ECF No. 46-1  (Clark

28

Decl. ¶¶ 2-6); Doc. 46-2 (Allison Decl. ¶¶ 2-6).  Accordingly, the Court finds that the conduct of Defendants Allison, Wan, and Reynoso sufficiently satisfies the causation requirement for section 1983.

       2.    <u>Eighth Amendment Conditions and Confinement</u>

       a.    **Legal Standard**

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment, but also from inhumane conditions of confinement.  <u>Morgan v. Morgensen</u>, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 847 (1994) and <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981)) (quotation marks omitted).  While conditions of confinement may be, and often are, restrictive and harsh, they must not involve the wanton and unnecessary infliction of pain.  <u>Morgan</u>, 465 F.3d at 1045 (citing <u>Rhodes</u>, 452 U.S. at 347) (quotation marks omitted).  Thus, conditions which are devoid of legitimate penological purpose or contrary to evolving standards of decency that mark the progress of a maturing society violate the Eighth Amendment.  <u>Morgan</u>, 465 F.3d at 1045 (quotation marks and citations omitted); <u>Hope v. Pelzer</u>, 536 U.S. 730, 737 (2002); <u>Rhodes</u>, 452 U.S. at 346.

Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety, <u>Johnson v. Lewis</u>, 217 F.3d 726, 731 (9th Cir. 2000) (quotation marks and citations omitted), but not every injury that a prisoner sustains while in prison represents a constitutional violation.  <u>Morgan</u>, 465 F.3d at 1045 (quotation marks omitted).  To maintain an Eighth Amendment claim, a prisoner must show that prison officials were deliberately indifferent to a substantial risk of harm to his health or safety.  <u>E.g.</u>, <u>Farmer</u>, 511 U.S. at 847; <u>Thomas v. Ponder</u>, 611 F.3d 1144, 1151-52 (9th Cir. 2010); <u>Foster v. Runnels</u>, 554 F.3d 807, 812-14 (9th Cir. 2009); <u>Morgan</u>, 465 F.3d at 1045; <u>Johnson</u>, 217 F.3d at 731; <u>Frost v. Agnos</u>, 152 F.3d 1124, 1128 (9th Cir. 1998).  A prisoner's claim does not rise to the level of an Eighth Amendment violation unless (1) "the prison official deprived the prisoner of the 'minimal civilized measure of life's necessities,'" and (2) "the prison official 'acted with

1  deliberate indifference in doing so.'" Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004)

2  (quoting Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) (citation omitted)).

3          Deliberate indifference requires a showing that prison officials were aware of a

4  "substantial risk of serious harm" to an inmate's health or safety and that there was no

5  "reasonable justification for the deprivation, in spite of that risk." Thomas, 611 F.3d at 1150

6  (quoting Farmer, 511 U.S. at 844).  The circumstances, nature, and duration of the deprivations

7  are critical in determining whether the conditions complained of are grave enough to form the

8  basis of a viable Eighth Amendment claim." Johnson, 217 F.3d at 731.

9          **b.       Objective Prong**

10         Plaintiff claims his Eighth Amendment right under the United States Constitution to be

11  free from cruel and unusual punishment was violated when Defendants deprived him of outdoor

12  exercise. Defendants argue that Plaintiff did not fulfill the objective requirement under the Eighth

13  Amendment because prison officials can temporarily restrict outdoor exercise to bring violence

14  and threats to institutional security under control.

15         Here, there is a genuine issue of material fact as to whether Plaintiff met the objective

16  requirement of his Eighth Amendment claim because he was denied outdoor exercise for periods

17  of 72 and 92 days.  In Allen v. Sakai, 48 F.3d 1082, 1087-89 (9th Cir. 1994), a prisoner alleged

18  that for six weeks he was only permitted forty-five minutes of outdoor exercise a week. The court

19  denied defendants' motion for summary judgment finding that the plaintiff had satisfied the

20  objective requirement of the Eighth Amendment analysis by claiming he was deprived of a basic

21  human need. Id. Here, Plaintiff alleges he was completely denied any outdoor exercise for over

22  two times the deprivation period in Allen.  Accordingly, this Court finds there is a genuine issue

23  as to whether Plaintiff was unconstitutionally deprived of a basic need for outdoor exercise. See

24  Jones v. Garcia, 430 F. Supp 2d 1095, 1102 (2006).

25         **c.       Subjective Prong**

26         Summary judgment may still be appropriate if there are no genuine issues of material fact

27  in dispute regarding whether the subjective prong of the Eighth Amendment analysis has been

28

30

satisfied, despite the fact that there are no genuine issues of fact regarding the objective prong. See Farmer v. Brennan, 511 U.S. 825, 834 (1994). Showing "deliberate indifference" requires a two part inquiry. Thomas v. Ponder 611 F.3d 1144, 1150 (9th Cir. 2010) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)). First, the inmate must show that the prison officials were aware of a "substantial risk of serious harm" to an inmate's health or safety. Id. Second, the inmate must show that the prison officials had no "reasonable" justification for the deprivations, in spite of that risk. Farmer, 511 U.S. at 844 ("Prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably."); Thomas, 611 F.3d at 1150.

## I.     Aware of a Substantial Risk

Defendants do not dispute that they knew of Plaintiff's deprivation of outdoor exercise during the lockdown periods. Defendants participated in the decision making to implement and continue the lockdowns which denied outdoor exercise. Additionally, Plaintiff and other inmates submitted repeated complaints to prison officials regarding the duration of the lockdowns and deprivation of outdoor exercise. (Pl's Opp. at 27-28., ECF No. 76.) The Ninth Circuit observed in Ponder:

> [f]or over thirty years, we have emphasized that "some form of regular outdoor exercise is extremely important to the psychological and physical well-being of the inmates." California strictly regulates this "regular outdoor exercise," ordinarily requiring prisons to provide inmates held in the general population with at least three hours of exercise per week and inmates held in segregation with at least one hour of exercise per day. . . .
>
> In light of the above, we conclude that the prison officials were aware as a matter of law of the potential consequences of depriving an inmate of out-of-cell exercise for an extended period of time.

Thomas, 611 F.3d at 1152 (internal citations omitted). Accordingly, the Court finds that Defendants were aware that Plaintiff's deprivation of outdoor exercise during the lockdown periods posed a substantial risk to his health.

## ii.     Reasonable Justification for the Deprivation

Defendants argue that although they were aware of the deprivation, their actions were reasonable in light of the security risks. "Because the Defendants' obligation to maintain order

and protect inmates and staff from assaults takes precedence over the prison's outdoor exercise programs, and the reasonable measures they took through the [lockdowns] fulfilled that obligation, [Plaintiff]'s rights under the Eight Amendment were not violated . . . ." (Def's Mot. Summ. J. at 23, ECF No. 45.)  Defendants have presented substantial evidence that the lockdown periods without access to outdoor exercise were necessary to protect both the safety of the inmates and staff.  While Defendants' actions may have been reasonable to address this goal, Defendants do not show any act aimed to provide inmates with any type of out-of-cell exercise during these lengthy repeated lockdowns.[5]  Spain, 611 F.2d at 200 (even where security concerns might justify a limitation on permitting a prisoner "to mingle with the general prison population" such concerns "do not explain why other exercise arrangements were not made.")  Plaintiff alleges that none of the housing units he was placed in contained Caucasian inmates.  Therefore, there was no reason why Plaintiff was denied access to the mini concrete yards attached to each housing unit.  (ECF No. 76 at 2.)  Accordingly, there exists triable issues of material fact as to whether Defendants' had a reasonable justification for the complete deprivation of outdoor exercise.

   3.   Qualified Immunity

   The doctrine of qualified immunity protects government officials from civil liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  To determine if an official is entitled to qualified immunity the court uses a two part inquiry.  Saucier v. Katz, 533 U.S. 194, 200 (2001).  The court determines if the facts as alleged state a violation of a constitutional right and if the right is clearly established so that a reasonable official would have known that his conduct was unlawful.  Saucier, 533 U.S. at 200.  A district court is "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity

---

[5] Plaintiff describes at length alternate measures that prison officials could take to provide out-of-cell exercise. Pl's Opp. at 59, 64, 69, 71-72.  However, the Court need not speculate on what actions prison officials could have taken.

32

1  analysis should be addressed first in light of the circumstances in the particular case at hand."

2  Pearson, 555 U.S. at 236.  The inquiry as to whether the right was clearly established is "solely a

3  question of law for the judge."  Dunn v. Castro, , 621 F.3d 1196, 1199 (9th Cir. 2010) (quoting

4  Tortu v. Las Vegas Metro. Police Dep't. 556 F.3d 1075, 1085 (9th Cir. 2009)).

5       As discussed above, the Court has found that there is a triable issue regarding whether the

6  lockdowns were continued with deliberate indifference to Plaintiff's right to outdoor exercise.

7  Thus, the second prong requires the court to determine if the law was clearly established at the

8  time Plaintiff was subjected to the modified program.

9       It is not clearly established exactly how or when prison officials must lift a lockdown or

10 modified program implemented in response to threats to the safety and security of the institution

11 arising from riots or information that inmates plan to assault staff.  Noble, 646 F.3d at 1143;

12 Norwood, 591 F.3d at 1070.  In light of the undisputed evidence regarding the reasons for the

13 lockdowns/modified programs, the investigatory steps undertaken in responding to the events,

14 and that prison officials lifted lockdowns/modified programs in stages depending upon the results

15 of the investigations, it would not have been clear to a reasonable officer that restricting an

16 inmate's outdoor exercise in conjunction with the lockdowns/modified programs during

17 investigations at issue here was unlawful.  Therefore, Defendants are entitled to qualified

18 immunity for the lockdowns instituted on July 25, 2008 and November 18, 2008.  Hence, since

19 the qualified immunity applies to the claim related to the denial of outdoor exercise, summary

20 judgment will be granted in favor of all Defendants on this claim.

21       4.    Injunctive Relief

22       Under Article III of the Constitution , the jurisdiction of federal courts is limited to

23 justiciable cases or controversies, and for a plaintiff's claim to be justiciable, the plaintiff must

24 have standing and the claim must not be moot. Jacobs v. Clark Cnty. Sch. Dist., 526 F.3d 419,

25 425 (9th Cir. 2008) (quotation marks and citations omitted); see also Summers v. Earth Island

26 Inst., 555 U.S. 488, 493, 129 S.Ct. 1142, 1149 (2009); Davis v. Fed. Election Com'n, 554 U.S.

27 724, 733-34, 128 S.Ct. 2759, 2768-69 (2008); Or. Advocacy Ctr., 322 F.3d 1101, 1108 (9th Cir.

28

2003); Bernhardt v. Cnty. of L.A., 279 F.3d 862, 868-69 (9th Cir. 2002). Constitutional standing requires, as an irreducible minimum, that there be (1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision. Or. Advocacy Ctr., 322 F.3d at 1108 (quotation marks and citations omitted); see also Summers, 555 U.S. at 493; Davis, 554 U.S. at 733; Jacobs, 526 F.3d at 425; Bernhardt, 279 F.3d at 868-69. While standing is determined based on the facts as they existed at the time the complaint was filed, an actual controversy must exist at all stages of review, and a claim becomes moot and nonjusticiable if the requisite personal interest captured by the standing doctrine ceases to exist at any point during the litigation. Jacobs, 526 F.3d at 425 (quotation marks and citations omitted); Or. Advocacy Ctr., 322 F.3d at 1116 (quotation marks and citations omitted); see also Alvarez v. Smith,130 S. Ct. 576, 580 (2009); Bernhardt, 279 F.3d at 872.

### a.    Capable-of-Repetition-Yet-Evading Review Exception

A prisoner's transfer away from the institution at which the challenged conduct is occurring will generally moot any claims for injunctive relief relating to the prison's policies, unless the suit is certified as a class action. Dilley v. Gunn, 64 F.3d 1365, 1368 (9th Cir. 1995) (quotation marks omitted); see also Nelson v. Heiss, 271 F.3d 891, 897 (9th Cir. 2001); Johnson v. Moore, 948 F.2d 517, 519 (9th Cir. 1991). The claim is not moot, however, if there is a likelihood of recurrence. Demery v. Arpaio, 378 F.3d 1020, 1026 (9th Cir. 2004) (quotation marks omitted). The capable-of repetition-yet-evading-review exception to the mootness doctrine applies when: 1) the duration of the challenged action is too short to be litigated prior to cessation; and 2) there is a reasonable expectation that the same party will be subjected to the same offending conduct. Demery, 378 F.3d at 1026 (quotation marks and citations omitted); see also Turner v. Rogers, 131 S.Ct. 2507, 2514-15 (2011); Alvarez, 130 S.Ct. at 581.

Here, the violation at issue are prolonged lockdowns at SATF which deny Plaintiff outdoor exercise. Since the filing of this complaint, Plaintiff has since been transferred to Calipatria State Prison.

1

## I.    Duration of Challenged Action

2    Given that lockdowns such as the ones complained of by Plaintiff are generally too brief

3    for the litigation process to redress and are capable of being repeated, the Court finds, that the

4    first prong is satisfied. See Turner, 131 S.Ct. at 2515 (imprisonment of up to twelve months too

5    short to be fully litigated); Demery, 378 F.3d at 1027 (pretrial detention temporary by nature).

6

### ii.    Reasonable Expectation of Transfer Back to SATF

7    Next, there must be a demonstrated probability or a reasonable expectation that Plaintiff

8    will be transferred back to SATF. Demery, 378 F.3d at 1027. There is no information in the

9    record concerning why Plaintiff was initially transferred to SATF in 2007 or why he was

10   transferred to Calipatria in 2010. Plaintiff fails to establish that there is a reasonable expectation

11   to be transferred back to SATF. Dilley, 64 13 F.3d at 1369; City of L.A. v. Lyons, 461 U.S. 95,

12   109 (1983) (finding that a the threat of reoccurrence is a real threat, rather than speculative).

13   'A federal court may issue an injunction if it has personal jurisdiction over the parties and

14   subject matter jurisdiction over the claim; it may not attempt to determine the rights of persons

15   not before the court.' Price v. City of Stockton, 390 F.3d 1105, 1117 (9th Cir. 2004) (quoting

16   Zepeda v. U.S. INS, 753 F.2d 719, 727 (9th Cir. 1985). As the claims in this action arise from

17   SATF and Plaintiff has since been transferred to Calipatria State Prison, the court does not have

18   jurisdiction in this action over prison officials at Calipatria State Prison and Defendants do not

19   have authority or control over Plaintiff and his conditions of confinement at Calipatria State

20   Prison. Plaintiff's request for injunctive relief is therefore moot, and thus, the Court cannot issue

21   an injunctive remedy against Defendants in this action. Dilley, 64 F.3d at 1369; Price, 390 F.3d

22   at 1117.

23

### IV.

24

### REMAINING CLAIM

25   Neither of the parties addressed Plaintiff's remaining claim relating to the Defendants

26   "fail[ure] to handle the situation in a way that would have minimized both the security risks that

27   led to the lock-downs and the length of the lock-downs." (F.&R. at 2, ECF No. 11.; see supra fn

28

2.)  As a result, the parties may seek leave from its previous Scheduling Order filed August 16, 2010 (ECF No. 28.) seeking leave to file additional dispositive motions in order to address Plaintiff's remaining claim.  A separate order will issue.

**V.**

**CONCLUSION AND RECOMMENDATION**

Based on the foregoing, it is HEREBY RECOMMENDED that Defendants' motion for summary judgment, filed June 21, 2011, be GRANTED.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of  28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

   **Dated:   March 15, 2013**

                                                      _____
                                                      UNITED STATES MAGISTRATE JUDGE

36