UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY LYNN NORWOOD, | Case No.: 1:09-cv-00330-AWI-SAB (PC) |
| Plaintiff, | FINDINGS AND RECOMMENDATION REGARDING DEFENDANTS' SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT |
| v. | |
| MATTHEW L. CATE, et al., | [ECF No. 107] |
| Defendants. | |

Plaintiff Gregory Lynn Norwood is appearing pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.

**I.**

**PROCEDURAL HISTORY**

This action is proceeding against Defendants Kenneth Clark, K. Allison, T.P. Wan, J. Reynoso, and W.J. Sullivan for subjecting Plaintiff to unconstitutional conditions of confinement in violation of the Eighth Amendment. Plaintiff claim arises out of Defendants allegedly setting up conditions that led to the deprivation of outdoor exercise during the lockdown periods of July 25, 2008 to October 25, 2008, and November 18, 2008 to January 29, 2009.

On June 21, 2011, Defendants filed a motion for summary judgment. (ECF No. 45.) Plaintiff filed an opposition on July 25, 2011. (ECF NO. 51.) On August 1, 2012, the Court issued a Findings and Recommendations recommending to grant Defendants' motion for summary judgment. (ECF No.

1

70.) On October 19, 2012, the Court issued an order permitting Plaintiff the opportunity to withdraw his opposition and file an amended opposition in light of Woods v. Carey, 684 F.3d 934 (9th Cir. 2012). (ECF No. 75.)

Plaintiff filed an amended opposition to the motion for summary judgment on November 13, 2012. Defendants filed objections to Plaintiff's amended complaint, which the Court construed as Defendants' reply. (ECF No. 77.)

On March 18, 2013, the undersigned issued Findings and Recommendations recommending to grant Defendants' motion for summary judgment; however, the issue whether Defendants set up conditions that led to rioting and lockdowns remained. (ECF No. 84.) The Findings and Recommendations were adopted in full on May 3, 2013. (ECF No. 92.) The matter was referred back to the undersigned for scheduling purposes on the remaining issue. (Id.)

On July 12, 2013, Defendants filed a supplemental motion for summary judgment. (ECF No. 107.) Plaintiff filed an opposition on September 10, 2013. (ECF No. 118.)

## II.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Wash. Mut. Inc. v United States, 636 F.3d 1207, 1216 (9th Cir. 2001). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence of absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1). The Court may consider other materials in the record not cited to by the parties, although it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. S.F. United Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).

Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If

Defendants meet their initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." In re Oracle Corp., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 323).  This requires Plaintiff to "show more than the mere existence of a scintilla of evidence." Id. (citing Anderson v. Liberty Lobby Inc., 477 U.S. 242, 252 (1986)).

However, in judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless Inc., 509 F.3d 978, 984 (9th Cir. 2007), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment.  Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2001).  The Court determines only whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a pro se prisoner.  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).

### III.

### DISCUSSION

#### A.     Remaining Claim

The remaining limited issue to be resolved by way of the instant motion is whether Defendants set up rioting conditions which lead to lockdown periods in violation of the Eighth Amendment.  That is, did the housing of a White inmate to house with a Crip inmate pose a sufficient objective risk of serious harm Plaintiff giving rise to an Eighth Amendment violation.  Defendants have previously been granted qualified immunity for the lockdowns instituted on July 25, 2008 and November 28, 2008, "in light of the undisputed evidence regarding the reasons for the lockdowns/modified programs, the investigatory steps undertaken in responding to the events, and that prison officials lifted lockdowns/modified programs in stages depending upon the result of the investigations, it would not have been clear to a reasonable officer that restricting an inmate's outdoor exercise in conjunction with the lockdowns/modified programs during investigations at issue here was unlawful."  (ECF No. 33:12-20.)

///

///

3

**B.    Summary of Defendants' Position**

Defendants present court four main arguments: 1) Defendants Allison, Wan, and Reynoso did not personally "cause" Plaintiff's alleged injury as required for § 1983 liability; (2) all of defendants actions to minimize the risk of harm on the exercise yard were reasonable; (3) the lockdowns on C-Facility lasted only as long as necessary to preserve institutional safety and security; and (4) defendants are entitled to qualified immunity.

**C.    Plaintiff's Position**

In his opposition, Plaintiff argues that defendants failed to reasonably respond to the threat posed by White inmates when they failed to remove the White Crip who was the target of the threat, or access the level of threat posed by other White inmates, and the release of the White Crip inmate to the dayroom to gauge his safety was pretextual.

**D.    Undisputed Facts[1]**

1.    Plaintiff is an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR).  (Norwood Depo. 6:10-7:1.)

2.    At all times relevant to this suit, Plaintiff was housed in Facility C of the California Substance Abuse and Treatment Facility (SATF) in Corcoran, California.  (Norwood Depo. 9:15-16.)

3.    Plaintiff is currently incarcerated at Calipatria State Prison.  (Norwood Depo. 63:13-16.)

4.    At all times relevant to this suit, Defendant Clark was Warden at SATF.  (Clark Dec. ¶ 1.)

5.    At all times relevant to this suit, Defendant Allison was the Chief Deputy Warden at SATF.  (Allison Decl. ¶ 1.)

6.    At all times relevant to this suit, Defendant Wan was an Associate Warden at SATF. (Wan Decl. ¶ 1.)

///

---

[1] The undisputed facts are limited in nature to address the sole remaining issue in this action as to whether Defendants set up conditions or failed to handle the situation which led to the lock periods, and the Court need not and does not expand to actions beyond that point in time.

7. At all times relevant to this suit, Defendant Reynoso was the C-Facility Captain at SATF. (Reynoso Decl. ¶ 1.)

8. From 2007 to 2010, Defendant Sullivan was the Associate Director for CDCR. Sullivan has retired. (Sullivan Decl. ¶ 1.)

9. The lockdown and modified programming that are the subject of this lawsuit occurred on C-Facility at SATF.

10. C-Facility at SATF is comprised of eight identical housing units (C1 through C8), each containing sixty-four cells. In 2008, C-Facility housed approximately 1200 Level IV general population inmates. (Clark Decl. ¶ 7; Allison Decl. ¶7.)

11. Based on an inmate's commitment offense and in-prison behavior, inmates classified as Level IV pose the highest security level threat. (Clark Decl. ¶ 7; Allison Decl. ¶ 7.)

12. Plaintiff is challenging the duration of two modified programs during his incarceration on C-Facility at SATF.

13. The first modified program, which lasted 92 days, and was in effect from July 25, 2008, to October 25, 2008. (Allison Decl., Ex. A pp. 1-35.)

14. The second modified program, which lasted 72 days, was in effect from November 18, 2008, to January 29, 2009. (Allison Decl. Ex. A pp. 36-55.)

Background on Modified Programming and Lockdowns

15. Normal programming means that inmates attend work and education programs; they have regular visiting, canteen and telephone privilege; can attend the law library and religious services; and they are released to the yard for recreation in large groups according to their yard schedule. (Clark Decl. ¶ 8.)

16. A modified program typically involves the suspension of various programs or services for a specific group of inmates, or in a specific portion of a facility. (Clark Decl. ¶ 10.) Generally, during a modified program, work, education, and outdoor exercise might be suspended; telephone, canteen, or visiting privileges might be restricted, and meals might be delivered to the inmates' cells rather than being served in the dining hall. (Clark Decl. ¶ 10.) These programs and privileges are

restored incrementally as the facility administration deems appropriate based on the overarching concern with maintaining safety of staff and inmates, and institutional security. (Clark Decl. ¶ 17.)

17. In contrast, a lockdown typically involves the restriction of all inmates to their cells or dormitory beds and the suspension of all programs and all but essential functions. Lockdowns can be imposed on the entire prison or on a specific facility within the prison. (Clark Decl. ¶ 16-17.) During a lockdown, inmate movement is strictly controlled, under close supervision, and under escort with the inmate placed in mechanical restraints. (Clark Decl. ¶ 16-17.)

18. True lockdowns are rare occasions and are generally imposed after serious threats to institutional security and the safety of both inmates and staff. (Clark Decl. ¶ 16.)

19. CDCR policies and procedures provide that whenever there is a serious incident, the priorities are as follows: (1) isolate, contain, and control the situation to the smallest possible area; (2) provide medical attention to all injured persons; (3) preserve all available evidence; (4) identify all involved persons; and (5) complete and submit appropriate written documentation and reports within the designated time frames. (Clark Decl. ¶ 9.)

20. When a lockdown is implemented, administrative staff, including, but not limited to, the Warden, the affected Facility Captain and the Associate Director of Missions are notified, but only the Warden, or his or her designee, has the authority to make adjustments to or terminate a modified program. With respect to the July 25, 2008, and November 18, 2008, modified programs at issue in this case, Warden Clark did not have a designee and had sole authority to adjust or terminate the modified programs.

21. After the initial response is completed, staff begins the assessment of the causes of the incident and the determination of the appropriate program activity status. (Clark Decl. ¶ 11.) Depending on the seriousness of the incident, it may be appropriate to modify or restrict program activities for some or all of the inmates. (Clark Decl. ¶ 11.)

22. Once a lockdown is instituted, the Warden, with input from the facility staff, decides when it is safe to unlock and return to normal programming. The main priority in determining when to unlock is always the safety of the inmates and staff. (Clark Decl. ¶ 11-20.)

6

23. All inmate cells, common areas, dining halls, janitorial rooms, and the outside yards are searched. Yard searches include digging up the ground to search for weapons that might be hidden for later use against staff or other inmates. In addition, members of the Inmate Advisory Council (IAC) are interviewed to both develop and substantiate information. Central files are reviewed to verify information. (Clark Decl. ¶ 11.)

24. After a lockdown, staff and all inmates, regardless of race, ethnicity, or gang affiliation, are interviewed to gather intelligence about the incident, and to determine whether it is safe to return to normal programming. (Clark Decl. ¶ 18.)

25. It may take several weeks to complete the necessary interviews, searches, and investigations. This time may be extended if critical information is discovered, or leads are developed requiring further investigation. Further delays will also occur if there are other incidents.

26. CDCR's policy is to return to normal programming as soon as it is safe to do so. (Clark Decl. ¶ 17.) The Warden generally requests that his staff prepare an unlock plan. The unlock plan depends on the nature of the incident and is developed on a case-by-case basis. Thus, the return to full program activities will be undertaken incrementally, depending on the magnitude and dynamics of the incident. (Clark Decl. ¶ 17.)

27. Programs and activities are also restored incrementally. (Clark Decl. ¶ 17.)

28. A determination is made regarding the inmates most likely to program successfully. Small groups of inmates may be released so that staff can monitor their conduct in a controlled environment and evaluate whether the planned unlock can proceed safely. (Clark Decl. ¶ 17; Allison Decl. ¶ 17; Wan Decl. ¶ 17.)

29. The risk associated with lifting modified programming prematurely, is that further incidents of violence can occur. For example, there have been instances at SATF and other prisons where inmates and correctional staff members were injured as a result of prison officials being unable to fully identify all of the inmates involved in an incident due to obstacles that include inmates not cooperating in investigations, or inmates providing incomplete or inaccurate information. Defendants were not, and are not willing to subject either inmates or correctional staff to unreasonable levels of

danger in an effort to rush back to normal programming. (Clark Decl. ¶ 21; Allison Decl. ¶ 21; Wan Decl. ¶ 21.)

30. If another incident occurs during the unlock process, previously restored programs may be rescinded so that an investigation of the new incident can be completed. If it is determined that returning the inmates to normal programming would pose too great a risk, the modified program may be continued. While some of the evidence gathered during the prior investigation is helpful, prison officials need to conduct a new investigation and assess the nature, scope, and duration of the most recent threat to safety and institutional security. (Clark Decl. ¶ 27; Allison Decl. ¶ 27; Wan Decl. ¶ 27.)

31. Inmates associate along racial lines. Members of each racial group tend to congregate and associate exclusively among those belonging to their own racial group. A Level IV general population is highly structured by prison and street gangs and an organized effort between races on these types of facilities is rare. Such organized efforts are usually carried out by members of a single racial group working together. Further, it is not uncommon for inmates to hide or pass weapons, or attempt to carry out an assault, for another inmate. And inmates who are not affiliated with a gang often are pressured by gang members to assist them in violent activities. (Clark Decl. ¶ 28; Allison Decl. ¶ 28; Wan Decl. ¶ 28.)

32. Incidents that begin without racial animus often rake on racial overtones. For example, a fight between two inmates of different races that has nothing to do with race may be interpreted by other inmates as an act calling for retaliation against members of a participant's racial group. (Clark Decl. ¶ 29; Allison Decl. ¶ 29; Wan Decl. ¶ 29.)

33. Inmates planning violence often target and threaten inmates of their same race. For example, when inmates planning violence realize that facility searches are ongoing and that the weapons they have hidden will eventually be discovered and confiscated, they sometimes threaten violence against other inmates of their same race to coerce them to move or hide weapons to prevent them from being discovered, or to assault other inmates or staff. If the innocent inmate does not comply, the threats of violence may be carried out against him. Consequently, it is sometimes necessary to lock down or place on modified program, inmates who may be innocent in the triggering

8

1  incident, in order to protect them from members of their own race.  (Clark Decl. ¶ 30; Allison Decl. ¶
2  30; Wan Decl. ¶ 30.)
3         34.    In early July 2008, a White inmate affiliated with the Crips, a primarily Black
4  disruptive group, transferred to SATF, and was housed on C-Facility.  (Reynoso Decl. ¶ 5.)
5         35.    Shortly after the White Crip arrived, staff received an anonymous note stating that the
6  "Woods" (White inmates) were planning to assault or kill him.  (Reynoso Decl. ¶ 6.)  Threats are
7  taken seriously, and an investigation began into the threats against this inmate.  (Reynoso Decl. ¶ 7.)
8         36.    Correctional Sergeant Garza interviewed the White Crip on July 18, 2010.  The White
9  Crip informed the Sergeant that he was accepted by the Black Crip inmate population on C-Facility,
10 building 7, and felt that he could safely program on that facility.  (Reynoso Decl. ¶ 8.)
11         37.    Sergeant Garza also interviewed two Black Crip inmates, including a member of the
12 IAC.  The IAC member stated that he did not think that the White inmates would do anything to the
13 White Crip.  The other Black Crip indicated that he was not aware of any problems between the White
14 Crip and the White inmate population.  (Reynoso Decl. ¶ 9.)
15         38.    To evaluate the situation between the two groups, the White Crip was not released to
16 the yard, but was given dayroom privileges.  This enabled staff to closely monitor the behavior of the
17 two groups, and determine whether there was any racial tension.  After several days of observation, no
18 friction between the two groups was noticed.  (Reynoso Decl. ¶ 11.)
19         39.    On July 25, 2008, a riot occurred on a Facility C recreation yard, involving
20 approximately twenty-two African-American inmates and six White inmates.  Responding staff
21 needed pepper spray to stop the incident.  Due to the magnitude of the incident, additional staff from
22 other facilities was called in to stop the violence.  One inmate was transported to an outside hospital
23 for further medical treatment due to serious bodily injuries.  During the search of the crime scene, staff
24 found an inmate-manufactured weapon.  Prison officials at SAT concluded that normal programming
25 activities posed an unnecessary risk to renewed violence until the causes of the violence were
26 investigated, discovered, and resolved.  Thus, all of the inmates in Facility C were immediately placed
27 on a modified program to protect both inmates and staff from serious bodily injury or death.  (Clark
28 Decl. ¶37a; Allison Decl. ¶ 37a, Ex. A. p.1.)

40. Norwood does not have any personal knowledge regarding the cause of the riot on July 25, 2008. (Norwood Depo. 42:25-44:4, 46:18-21.)

### F. Legal Analysis

#### 1. Eighth Amendment Legal Standard

Section 1983 provides a cause of action for the violation of constitutional or other federal rights by persons acting under color of state law. Nurre v. Whitehead, 580 F.3d 1087, 1092 (9th Cir. 2009); Long v. Cnty of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006); Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002). Under section 1983, Plaintiff must demonstrate a link between the actions or omissions of each named defendant and a violation of his rights. Ashcroft v. Iqbal, 556 U.S. 662, 676-677 (2009); Simmons v. Navajo Cnty. Ariz., 609 F.3d 1011, 1020-1021 (9th Cir. 2010); Ewing v. City of Stockton, 588 F.3d 1218, 1235 (9th Cir. 2009); Jones, 297 F.3d at 934. The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement. Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006).

To determine if the conditions of confinement meet the objective prong of the Eighth Amendment analysis, Plaintiff must demonstrate that prison officials' conduct deprived him of "the minimal civilized measure of life's necessities." The Court must access "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwilling to such a risk." Neal v. Shimoda, 131 F.3d 818, 833 (9th Cir. 1997) (quoting Helling v. McKinney, 509 U.S. 25, 36 (1993) (emphasis in original). While conditions of confinement may be, and often are, restrictive and harsh, they must not involve the wanton and unnecessary infliction of pain. Morgan, 465 F.3d at 1045.

#### 2. Causation as to Defendants Allison, Wan, and Reynoso

In the initial motion for summary judgment, Defendants raised this very same argument which the Court found to be without merit. In rejecting this argument, the Court made the following ruling,

> As employees of CDCR, Defendants acted under color of state law in executing the duties of their positions relating to the implementation and continuation of lockdowns at SATF. Defendants argue that judgment should be in favor of Defendants Allison, Wan, and Reynoso because they did not control the duration or scope of the lockdowns,

> and therefore they did not "cause" Plaintiff's alleged injury as required for § 1983 liability. (citation.)  Defendants assert only Defendant Clark in his capacity as Warden, had the authority to modify or terminate the lockdowns. (citations.)
>
> Defendants Allison, Wan, and Reynoso "participate[d] in [Defendant Clark's] affirmative acts," through giving advice, expertise and recommendations to enable Defendant Clark to approve of the scope and duration of the lockdowns.  See Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).  Defendant Clark stated in his declaration that: 1) he considered the programming recommendations and evidence provided by subordinate staff to assess the need for the lockdowns and to determine when the lockdowns could safely end; 2) he relied upon the investigations, analysis, and opinions of his staff regarding the status of any ongoing investigations, the evidence collected, the effectiveness of the restrictions imposed as part of the modified program, the likelihood that violence would occur without the restrictions in place, the appropriateness of the scope of the restrictions, and the prospects and timetable for a phased unlock to return to normal programming. (citations.)  It is clear that Defendants Allison, Wan, and Reynoso were part of Defendant Clark's decision making process to implement, continue and discontinue the lockdowns. (citations.)

(ECF No. 84, Findings and Recommendation, 28:6-27, adopted in full ECF No. 92.)

Under the "law of the case" doctrine, this finding is final and not subject to re-evaluation.  The "law of the case" doctrine states the decision on a legal issue by the same court must be followed in all subsequent proceedings in the same case.  Though the rule is discretionary, in general, "in order to maintain consistency during the course of a single case, reconsideration of questions previously decided should be avoided."  United States v. Mills, 810 F.2d 907, 909 (9th Cir. 1987).  For the doctrine to apply, "the issue in question must have been decided explicitly or by necessary implication in [the] previous disposition."  Milgard Tempering, Inc. v. Selas Corp. of Am., 902 F.2d 703, 715 (9th Cir. 1990) (internal quotation marks omitted) (edit in original).  This rule promotes finality, and thus, the discretion of a court to revisit issues previously decided should be exercised sparingly.  Moore v. James H. Matthews & Co., 682 F.2d 830, 833-834 (9th Cir. 1982).

Because this issue was explicitly decided in the prior ruling on the initial motion for summary judgment, which is now final, and there is no basis for reconsideration of the ruling set forth by Defendants, the argument is barred by the "law of the case doctrine."

///

///

### 3. Objective Component of Eighth Amendment

Plaintiff contends that prison officials knew that allowing all White inmates out to yard at the same time would result in a riot. Plaintiff contends that White inmates posed the threat to the White Crip inmate and prison officials failed to measure the level of threats posed by those inmates.

Plaintiff has not meet his burden of meeting the objective prong of his Eighth Amendment claim in that there is no evidence to suggest deliberate indifference by any Defendant to a known risk to Plaintiff's safety by the placement of the White inmate with Crip inmates in July 2008.

Plaintiff has not raised a genuine issue regarding the objective prong of his Eighth Amendment allegation against the named Defendants. The White Crip inmate was a newly arrived inmate and there was no history of violence or overly hostile encounters known to Defendants between that inmate and the White inmates on C-Facility. Plaintiff does not have any personal knowledge regarding the cause of the riot on July 25, 2008. (Norwood Depo 42:25-44:4, 46:18-21.) It is undisputed, by Plaintiff's own admission, that prison officials, including Defendants met with, and interviewed the White Crip, and were reassured that he did not fear for his safety. Prison officials took further measures by monitoring the dayroom activities to gauge whether there was any tension between the two groups of inmates, and no friction was detected. Given the personal assessment and reasonable measures taken by prison officials in determining the level of threat posed by the anonymous note, any risk posed by the housing of the White Crip with the other Crip inmates is not obvious enough to lead to an inference of subjective awareness of a substantial risk of harm to Plaintiff by the denial of outdoor exercise for periods of 72 and 92 day, as required by the Eighth Amendment. This is the only risk that is at issue in determining whether Defendants set up conditions or failed to handle the situation that lead to the riots, posing a specific risk of substantial harm to Plaintiff only.

Neither Defendants nor Plaintiff himself had any reason to believe, based on the reasonable investigation, that the housing of the White Crip posed a significant risk of danger to Plaintiff himself under these particular circumstances. Based on the undisputed evidence, it cannot be concluded that any of the Defendants unconstitutionally exposed Plaintiff to a substantial risk of serious harm (denial of outdoor exercise for periods of 72 and 92 and days, irrespectively). Any potential risk to Plaintiff

specifically is not obvious enough to lead to an inference of subjective awareness of a substantial risk of harm to Plaintiff by a riot leading to modified programming. The simple allowance of a White inmate to house with a Crip inmate simply does not give rise to a substantial risk of serious harm for purposes of an Eighth Amendment claim.

The fact that physical harm may have resulted to other inmates, not including Plaintiff, does not support his claim as Plaintiff has no standing to raise another inmate's constitutional challenge. [2] Plaintiff has offered no evidence, other than his bare assertion, that the placement and retention of the White Crip inmate with the Crip inmates generally rendered Plaintiff's safety at risk. This conclusion, standing alone, does not show that any Defendants placed Plaintiff in a sufficiently serious risk of substantial harm. Thus, there is not substantial evidence demonstrating to what risk, if any, Plaintiff was exposed because Defendants allowed the White inmate to be housed with the Crip inmates. This ends the inquiry of this Eighth Amendment claim as a violation can only be established if both the objective and subjective requirements are met. See Farmer v. Brennan, 511 U.S. 825, 834 (1994) (prisoner must meet two requirements to demonstrate that his Eighth Amendment rights have been violated, which includes both an objective requirement of a substantial risk of serious harm and a subjective awareness of deliberate indifference to the prisoner's health or safety.) Accordingly, Defendants Kenneth Clark, K. Allison, T.P. Wan. J. Reynoso, and W.J. Sullivan, are entitled to summary judgment with respect to Plaintiff's Eighth Amendment claim based on their housing of the White inmate with the Crip inmates.

///

///

///

---

[2] Federal courts are limited to deciding cases and controversies, and the issue of standing is one feature of such limitation. Am. Legal Found v. FFC, 808 F.2d 84, 88 (D.C. Cir. 1987) (citing Valley Forge Christian College v. American United for Separation of Church & State, Inc., 454 U.S. 464, 471 (1982)). Standing must be determined in order to establish jurisdiction of the Court to hear the case and reach the merits. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998); Grand Council of the Crees v. FERC, 198 F.3d 950, 954 (D.C. Cir. 2000). To have Article III standing, a plaintiff must establish: (1) [he] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical: (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 180-181 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992)).

# IV.

# RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      Defendants' supplemental motion for summary judgment be GRANTED; and

2.      Judgment be entered in favor of Defendants.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **January 6, 2014**

UNITED STATES MAGISTRATE JUDGE